IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

REBECCA SMITH, ELLEN LARSON, JUSTINE LUND; and JAIME and
JARED BEARD, individually and on behalf of all others similarly situated,

v.

THE ALIERA COMPANIES, INC., formerly known as ALIERA
HEALTHCARE, INC., a Delaware corporation, TRINITY HEALTHSHARE,
INC., a Delaware corporation, and ONESHARE HEALTH, LLC, formerly
known as UNITY HEALTHSHARE, LLC and as KINGDOM
HEALTHSHARE MINISTRIES, LLC, a Virginia limited liability corporation.

# EXHIBIT A
# Part 1 of 5
## to
## NOTICE OF REMOVAL

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.

ELLEN LARSON, individually and on behalf of all others similarly situated,

     Plaintiff,

  v.

THE ALIERA COMPANIES, INC., a Delaware corporation;
ALIERA HEALTHCARE, INC., a Delaware corporation; and
TRINITY HEALTHSHARE, INC., a Delaware corporation,

     Defendants.

---

## CLASS ACTION COMPLAINT

---

## I. PARTIES

1.     Plaintiff ELLEN LARSON is a citizen of Colorado who resides in Colorado Springs. Ms. Larson was enrolled in a health care plan from Defendants Aliera Healthcare and/or Trinity Healthshare from July through December, 2018.

2.     Defendant ALIERA HEALTHCARE, INC. is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit business, without any express religious affiliation.

3.     Defendant THE ALIERA COMPANIES, INC. is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit entity without any express religious affiliation. Based on information and belief, it either changed its name from ALIERA HEALTHCARE, INC., or is the parent corporation of Aliera Healthcare, Inc. Collectively, defendants The Aliera Companies, Inc. and Aliera Healthcare, Inc. are referred to as "Aliera."

4. Defendant TRINITY HEALTHSHARE, INC. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity. Trinity was incorporated on or about June 27, 2018. Aliera and Trinity are collectively referred to as "Defendants."

5. Aliera markets, sells, and administers insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force on behalf of Trinity.

6. Neither Aliera nor Trinity hold a certificate of authority from the Colorado Division of Insurance as required by § 10-3-105 C.R.S., and neither are authorized or licensed to provide any type of insurance plan in Colorado.

## II. JURISDICTION AND VENUE

7. Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1332(a) and § 1367 because there is diversity of citizenship and the amount in controversy related to the proposed class claims exceeds $75,000.

8. Venue is proper because some of the acts or omissions occurred in the District of Colorado, and the named Plaintiff and many of the proposed class members reside in Colorado.

## III. NATURE OF THE CARE

9. When Congress passed the Patient Protection and Affordable Care Act ("ACA") in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("HSCMs"). In order to qualify as an HSCM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or

religious beliefs and share medical expenses among members according to those beliefs;" and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii).

10.     Defendants, in an attempt to exploit this exception, falsely represented that Trinity has been "recognized" as an HCSM. Trinity did not meet the requirements of 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence until 2018, and because it did not require its members to adhere to its stated ethical or religious beliefs. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created.

11.     While falsely representing that Trinity is a recognized HCSM, Defendants issued illegal and unauthorized health insurance products to citizens of the State of Colorado. They sold illegal insurance plans to hundreds, if not thousands, of Colorado residents. These plans did not comply with the minimum basic requirements for authorized health care plans under state or federal law, and have resulted in Colorado residents (1) paying for an illegal contract, and (2) being denied coverage for medical care required by law to be provided. Aliera and its owners, however, have realized exorbitant profits, by taking over 83% of all payments made by individuals, while refusing to pay claims.

12.     Aliera, using Trinity as a purported HCSM, created, marketed, sold, and administered plans in Colorado. These plans qualify as health insurance under Colorado law, §10-1-102(6)(a) C.R.S. and are unauthorized under §10-3-105 C.R.S. The unauthorized insurance plans created, marketed, sold, and administered by Defendants

did not meet the minimum benefits, coverage and other requirements for health insurance in Colorado.  They are illegal contracts.

13.     Defendants' representations that the insurance plans were HCSM plans were misleading, unfair and/or deceptive in violation of the Colorado Consumer Protection Act.  At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law as represented.

14.     Plaintiff, on behalf of the class she seeks to represent, filed this lawsuit to obtain declaratory and injunctive relief to prevent Defendants from continuing to create, market, sell, and administer unauthorized and illegal health insurance plans in Colorado.  On behalf of the proposed class and on her own behalf, Plaintiff also seeks damages related to uncovered health care expenses, premiums paid and other losses due to Defendants' creation, marketing, sale, and administration of unauthorized and illegal health insurance plans.

15.     Specifically, Defendants created, marketed, sold, and administered plans that provided certain payment benefits in the event of specified health-related contingencies in exchange for a monthly payment.  The amount of benefits was tied to the amount of the monthly premium payment and the cost incurred by the customer for health-related medical treatments.  Under Colorado law, the arrangement fits squarely within the definition of "insurance" and may not be marketed, sold or administered without meeting minimum requirements and obtaining authorization from the Colorado Department of Insurance.

## IV.  CLASS ALLEGATIONS

16.     **_Definition of Class:_**  Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of herself and all persons similarly situated.  The proposed Class is defined as follows:

> All Colorado residents who purchased a plan from any of
> Defendants or their subsidiaries that purported to be "health
> care sharing ministry" plan at any time since June 29, 2018.

17.     ***Size of the Class:***  The Plaintiffs' proposed class is so numerous that

joinder of all members is impracticable.  Hundreds, if not thousands, of individuals in

Colorado are covered by Defendants' plans.

18.     ***Common Questions of Fact and Law:***  There are questions of law and fact

that are common to all class members including:  (1) whether the healthcare products

that the Defendants created, marketed, sold, and administered to class members met the

legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether plans sold were

"insurance" under Colorado insurance law; (3) whether Colorado insurance law and

regulations forbid the creation, marketing, sale, and administration of health care

products in the "business of insurance" without authorization or other legal exception;

(4) whether Defendants failed to obtain proper authorization for the creation,

marketing, sale, and administration of an insurance product in Colorado; (5) whether

class members are entitled to (a) rescission of the plan(s) and refunds of all premiums

paid and/or (b) reformation of the plans to comply with the minimum insurance

coverage requirements of Colorado and federal law, and re-processing of all claims for

expenses and costs incurred that would have been covered had the plan(s) properly

complied with those laws; (6) whether Defendants' actions were "unfair" and/or

"deceptive" under the Colorado Consumer Protection Act ("CCPA"); and (7) whether

class members are entitled to other damages, including statutory treble damages,

resulting from Defendants' unfair and/or deceptive acts.

19.     ***Class Representative:***  The claims of the named Plaintiff are typical of the

claims of the proposed class as a whole resulting from Defendants' sale of unauthorized

and illegal insurance plans.  The named Plaintiff will fairly represent and adequately

protect the interests of the class members because she has been subjected to the same practices as other class members and suffered similar injuries. The named Plaintiff does not have interests antagonistic to those of other class members as to the issues in this lawsuit.

20.    *Separate Suits Would Create Risk of Varying Conduct Requirements*. The prosecution of separate actions by class members against Aliera and/or Trinity would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

21.    *Defendants Have Acted on Grounds Generally Applicable to the Class.* Defendants Aliera and Trinity have uniformly created, marketed, sold and administered unauthorized health insurance plans in Colorado. They have misrepresented the plans as HCSM plans under federal law. Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the whole class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

22.    *Questions of Law and Fact Common to the Class Predominate Over Individual Issues.* The claims of the individual class members are more efficiently adjudicated on a class-wide basis. Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Aliera and/or Trinity for the relief requested in this action. Issues as to Aliera's and/or Trinity's conduct in applying standard marketing, sales and administration practices towards all members of the class

predominate over questions, if any, unique to members of the class. Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

23. *Venue*. This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and where Plaintiff resides.

24. *Class Counsel*. Named Plaintiff has retained experienced and competent class counsel.

## V. FACTUAL BACKGROUND

### *Aliera Seeks Out an HCSM to Avoid Insurance Requirements, But Its First Relationship Ends in Litigation*

25. Defendant Aliera Healthcare, Inc. was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife Shelley Steele, and their son Chase Moses, in December 2015. Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury. As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over 6 years in prison, and ordered to pay $1.65 million in restitution.

26. Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders..." The formation documents of Aliera Healthcare, Inc. do not include any discussion of religious or ethical purposes or missions.

27. Non-party Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM. CMS had provided a letter to Anabaptist that it met the requirements under 26 U.S.C. § 5000A to operate an HCSM. Specifically, CMS found that Anabaptist had been "in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously and without interruption since December 31, 1999."

28. Upon his release from prison, and after forming Aliera, Timothy Moses convinced Anabaptist to permit Aliera to market HCSMs using Anabaptist's designation. Anabaptist created a wholly-owned subsidiary, called Unity Healthshare ("Unity"), for that purpose. Under the proposal, Aliera would market the plans in exchange for a $25 per member per month fee for its administrative services.

29. Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer health products to the public that did not meet the insurance benefits and coverages required by the Affordable Care Act through its HCSM exemption in 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, increasing members to Anabaptist's HCSM.

30. Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were reserved for payment of benefits to Unity members.

31. In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Mr. Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits. It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

32.     Unity terminated the relationship with Aliera in summer, 2018.   A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County Georgia in late 2018.  *See Aliera Healthcare v. Anabaptist Health Share et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.).  As a result of the lawsuit, a court-ordered receiver now monitors Aliera's administration of HCSM assets and benefits for Unity members.  *See **Appendix A***, Order Entering Interlocutory Injunction and Appointing Receiver dated April 25, 2019.

### *Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements*

33.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM.  Trinity was therefore created by Aliera and its principals on June 27, 2018 as a purported nonprofit entity.  William Rip Theede, III was the CEO of Trinity.  Mr. Theede is a former Aliera employee.  He is also a close family friend of the Moses family and officiated at Chase Moses' wedding.

34.     Trinity had no predecessor entity.

35.     Trinity had no members when it was formed.

36.     Trinity could not qualify as an HCSM because it was created after December 31, 1999, and at the time of its creation, had no members.  In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).  Trinity has not had members who have shared medical expenses "continuously and without interruptions since at least December 31, 1999."

37.     In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. . . ." 26 U.S.C. § 5000A(d)(2)(B)(III).  Although Trinity's bylaws set forth a specific set of religious beliefs, it has never restricted its membership to those individuals who affirm the specific common beliefs.

38.     Trinity's bylaws (1) set forth a Protestant understanding of the Bible as the "final and only source of absolute spiritual authority," (2) affirm God is "triune," or a trinity, (3) set forth an orthodox view of Jesus Christ as fully God and fully man, (4) affirm Jesus Christ as sinless, and the result of a virgin birth, (5) affirm that people can only be saved "by grace alone, through faith alone," and (6) affirm the literal resurrection of Jesus Christ.

39.     Nevertheless, Trinity does not require members to affirm agreement to any of these sectarian principles, and does not exclude members from faiths that do not adhere to these beliefs.  Members are only asked to generically affirm a "Statement of Beliefs" that "personal rights and liberties originate from God," "every individual has a fundamental right to worship God in his or her own way," there is a moral obligation "to assist our fellow man when they are in need," there is a duty to "maintain a healthy lifestyle," and a fundamental right of conscience to direct one's own healthcare exists. See *Appendix B,* p. 21.  As stated in "frequently asked questions" on Defendants'' website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates."  ***Appendix C, p. 11.***

40.     While prospective agents must take a training assessment, the questions asked in the assessment do not address any religious or ethical motivation.  Defendants'

– 10 –

advertisements for prospective agents, and the training materials for agents do not mention a religious or ethical component for purchasers of these plans.

41.     In a video posted to YouTube dated November 1, 2018, an unidentified Aliera trainer for new or prospective agents discussed the Aliera Healthcare Enrollment Process.  According to the video, in order to enroll in Aliera, the consumer must positively respond to a number of questions.  The first question asks if the consumer agrees with Trinity's "statement of faith:"

> **At the core of what the Healthcare Sharing Ministry does, and how they relate to and engage with one another as a community of people is a set of common beliefs**.
>
> 1. We believe that our personal rights and liberties originate from God and are bestowed on us by God.  2. We believe that every individual has a fundamental religious right to workshop God in his or her own way.  3. We believe it is our moral and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity.  4. We believe it is out spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to ourselves or others.  5. We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors.
>
> o  Yes
>
> o  No

42.     The training explains what the "statement of faith" means:

> Just to give you a general overall synopsis of what it's saying … It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining

a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits - things that, you know, cause us illness that are in our control.

As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

43.     Defendants represent that Trinity is "recognized" as a qualified HCSM. *See* ***Appendix D***. It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was even created. In 2013, the United States Department of Health and Human Services ("HHS") promulgated a rule under which it certified HCSMs by issuing a certificate of exemption to the entity. However, the rule was eliminated in 2016. *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs). Trinity has never appeared on any list of recognized HCSMs developed by HHS.

44.     Likewise, the Internal Revenue Service ("IRS") does not and has never recognized any entities as HCSMs. Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns. The IRS has never recognized Defendants as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B). Defendants' representations to the contrary are false and misleading.

45.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale and administration of the purported HCSM plans. The contract allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control of the money, the administration of the plans, and the membership roster.

### The Products Defendants Create, Market, Sell, and Administer are Health Insurance

46.     During certain times on and after June 27, 2018, when Defendant Trinity was incorporated, Plaintiff and members of the class have been, are, or will be enrolled in healthcare insurance products created, marketed, sold, and administered by Defendants that Defendants claimed were HCSM plans.

47.     The healthcare products marketed, sold, and administered charge "members" a "monthly contribution" to participate.  Defendants described the "contributions" members pay as "premiums."  *See e.g., **Appendix C**, pp. 3-4.*

48.     The amount of the premium charged is based on the medical program selected by the insured.  The programs include "interim medical," "comprehensive," "standard," "basic care," and "catastrophic." *Id.,* p. 1.  The programs require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount." *Id.,* p. 4.  Once this amount has been paid, then medical bills are paid in accordance with a benefits booklet or member guide for the selected program.  These benefit booklets contain the "membership instructions" which detail the "eligible medical expenses," "limits of sharing," limitations on pre-existing conditions, and exclusions.  The programs require pre-authorization of certain non-emergency surgeries, procedures or tests, as well as for certain types of cancer treatments.  *See e.g., **Appendix B**,* p. 29.

49.     The programs are offered at least three benefit levels.  The programs at the higher levels charge more and therefore provide more robust benefits for covered medical conditions.  ***Appendix C***, p.1

50.     The programs provide coverage for medical expenses.  Among other things, the programs provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, and

emergency room services. *Appendix B*, pp. 22-25. The programs, for an additional premium, will also provide maternity care. *Appendix C, p. 7.*

51.     The programs have established preferred provider networks ("PPOs") through which members can seek care. Payments are made by Defendants directly to providers.

52.     The programs contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

53.     Payments are made to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or "Member Shared Responsibility Amount," and otherwise meet the coverage requirements set forth in the coverage booklet. These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

54.     Payment from the program upon the occurrence of a covered loss is not voluntary. Under the terms of the program, as set forth in the Member Guide, Trinity is instructed and required to "share clearing house funds in accordance with the membership instructions." *Appendix B*, p. 21 (Contributors' Instructions and Conditions). The "membership instructions" is nothing more than a booklet of benefits created by Defendants. The members have no role in the creation of the benefits booklet. Members do not decide who gets paid benefits. Instead, according to the Member Guide, the members must accept Trinity's adjudication of benefits: "By participation in the membership, the member accepts these conditions." According to the benefits booklet, Trinity, and not the members, is the "final authority for the interpretation" of the membership instructions, and Trinity directs payment to

providers on behalf of members who have submitted medical claims that are covered under the benefits booklet. *Id.*

55.     Members' "contributions" (i.e. premiums) are not refundable. Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses. *Id.*, p. 18.

56.     Defendants' programs are contracts whereby Defendants undertake to indemnify a member upon the occurrence of determinable contingencies and therefore constitute "insurance" as defined by Colorado law. *See* §10-1-102(12) C.R.S.  The Colorado Division of Insurance has so concluded.  ***Appendices E and F.***  Defendants are required to comply with Colorado and federal law governing insurers.

### *The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal*

57.     Defendants do not have a certificate of authority as required by § 10-3-105 C.R.S. from the State of Colorado to issue insurance within this state and are not authorized insurers under Colorado law.  Defendants have issued illegal and unauthorized insurance products to Plaintiff and other members of the class.

58.     Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements under the ACA's Essential Health Benefits.  For example, the policies impose a 24-month waiting period on coverage, which is illegal under the ACA.  *See* 42 U.S.C. §300gg-3. *See also*, § 10-16-118 C.R.S.

59.     The plans purport to require binding arbitration, which is illegal in Colorado.  § 10-3-1116(3) C.R.S.

60.     The benefits booklet, which has never been reviewed or approved, contains inconsistent and contradictory coverage terms and conditions.  For example, on one hand it suggests that Defendants are required to administer benefits in

accordance with the terms of the benefits booklet, while other provisions suggest that Defendants are not required to pay any benefits whatsoever.  The benefits booklet also states the plan is an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," but in fact Defendants – like an insurance carrier -  make all coverage decisions without ever presenting one member's needs to other members.

### Multiple States Have Found that Aliera and Trinity Are Illegally Marketing, Selling and Administering Insurance Products That Do Not Qualify as HCSMs

61.     On August 12, 2019, the State of Colorado Division of Insurance found Defendants were selling insurance products, and issued cease and desist orders ordering them to immediately stop selling the unauthorized insurance in the State of Colorado.  *Appendices E and F*.

62.     The State of Texas has successfully enjoined Aliera from enrolling any new members in Texas.  As the Texas Attorney General argued on July 11, 2019 in *State of Texas v. Aliera Healthcare, Inc.*, Travis County Cause No. D-1-GN-19-003388:

> The Defendant Aliera Healthcare, Inc., is engaged in the business of insurance in this State without a license, in violation of Tex. Ins. Code § 101.101.  … In meetings with State regulators, Aliera representatives have asserted that Aliera is exempt from state regulation because it merely administers a "health care sharing ministry." ***Aliera is no ministry, however; it is a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to "administrative costs."***

*Appendix G,* pp. 1-2 (emphasis added).

63.     The Washington Insurance Commissioner, Mike Kriedler, conducted a formal investigation in response to consumer complaints and concluded that Trinity did not meet the statutory definition of an HCSM under Washington and federal law.  *See Appendix H.*  Commissioner Kriedler further concluded that Aliera acted as an

unauthorized health care service contractor without being registered and was doing business as an unlicensed discount plan organization, and that Aliera's advertisements on behalf of Trinity were deceptive and had the capacity to mislead or deceive consumers into believing that they purchased insurance. On May 13, 2019, Commissioner Kriedler issued "Orders to Cease and Desist" to Aliera and Trinity. *See id.* and *Appendix I.* On December 30, 2019, Trinity entered into a consent order that prohibited it from enrolling any new Washington residents, and was fined $150,000. *Appendix J.*

64.     The New Hampshire Insurance Department entered a Cease and Desist Order against Aliera and Trinity on October 30, 2019, ordering them to stop selling or renewing illegal health insurance in New Hampshire. *Appendix K.*

65.     Regulators in Georgia have also issued warnings. *See e.g. Appendix L.*

### *Plaintiff Was Sold Sham Products by Aliera/Trinity That Did Not Provide the Benefits Promised*

66.     Plaintiff Larson enrolled in AlieraCare in July of 2018, while Aliera partnered with Unity.

67.     Her plan through Aliera/Unity was subsequently transferred to Aliera/Trinity.

68.     She made a payment to Aliera for $452.44 and to Unity for $25 in July 2018, and made monthly premium payments of $352.44 per month each month from August through December 2018.

69.     Ms. Larson received what she believed was an insurance card from Aliera/Trinity. *See Appendix D.* The insurance card falsely stated that she was a member "of a Health Care Sharing Ministry *recognized pursuant to 26 U.S.C.*

*§ 5000A(d)(2)(B)*" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM.

70.     The AlieraCare Trinity plan sold to Ms. Larson was insurance under Colorado law.  However, it failed to comply with Colorado and federal law in its provisions of benefits.

71.     Ms. Larson was assaulted on August 3, 2018, while covered by Defendants' Plan.  She was attacked and knocked unconscious.  She was taken to the hospital with serious injuries, including a skull fracture, cervical spine fracture, and intercranial bleeding. When she submitted her bill for payment by Defendants, her claim was denied.  When she appealed, Defendants decided to cover a different denied claim as a result of the appeal.  *Appendix M.*

72.     Ms. Larson appealed a second time.  Defendants then took the position that Ms. Larson's injuries were "self-inflicted" and excluded under her policy. *Appendix  N.*

73.     Ms. Larson continues to be pursued for these debts.

## VI.  CLAIMS FOR RELIEF

### A.     Illegal Contract

74.     Plaintiffs reallege all prior allegations as though fully stated herein.

75.     Defendants sold Plaintiff and all members of the proposed class unauthorized and illegal health insurance plans in violation of Colorado law:

   a.  The plans were insurance, but were sold without authorization in
       Colorado.

   b.  The plans failed to provide the essential health benefits required under the
       ACA, and Colorado law.

    c.   The plans exclude coverage for pre-existing conditions and impose waiting periods.

    d.   The Member Guide contains inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

    e.   The plans included a binding arbitration provision illegal under Colorado law. §10-3-1116 C.R.S.

76.    Plaintiff and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under Colorado and federal law.

**B.    Violation of the Colorado Consumer Protection Act**

77.    Plaintiffs reallege all prior allegations as though fully stated herein.

78.    Defendants' creation, marketing, sale and administration of unauthorized health insurance plan(s) to class members constitutes unfair and/or deceptive acts under the Colorado Consumer Protection Act ("CCPA").  Under the CCPA, Plaintiffs and members of the proposed class are entitled to damages, injunctive relief, statutory treble damages (up to $25,000 for each violation) and attorneys' fees and costs.

79.    Defendants have committed the following unfair acts or practices that are deceptive or misleading or have the capacity to be deceptive or misleading. These acts or practices include, but are not limited to, the following:

    (a)    Defendants have advertised and represented that Trinity is a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)." This is false and/or misleading for at least the following reasons:

        (i)    Trinity has not "been in existence at all times since December 31, 1999, and medical expenses of its members have been shared

continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).  It therefore is not, as a matter of law, a HCSM.

(ii)     Trinity was never "certified" or "recognized" by any governmental agency as an HCSM.

(iii)     Trinity is not now, and was never on, the list of recognized HCSMs created by the Department of Health and Human Services.

(iv)     The Department of the Treasury/IRS has never recognized, approved or disapproved entities as HCSMs under 26 U.S.C. § 5000A.  It has no process for doing so.

(v)     Trinity does not restrict membership to only those members that share its beliefs as set forth in its bylaws as required by 26 U.S.C. § 5000A.  Rather, individuals who do not share Trinity's Protestant statement are allowed membership.

(b)     Defendants have consistently and repeatedly represented that AleriaCare/Trinity and related products are "not insurance."  This representation appears in the benefits book, in advertising material, in training material and on its webpages.  This representation, however, is false and/or misleading. Under Colorado law, Defendants are offering insurance to members of the public.

(c)     Defendants' insurance products include provisions, conditions, exclusions and restrictions that are illegal under Colorado law.  These include, but are not limited to, the following:

(i)     Defendants purport to require members to submit disputes to arbitration even though Colorado law prohibits binding arbitration agreements in insurance contracts.

(ii)     Defendants purport to exclude certain pre-existing conditions even though such exclusions are illegal under Colorado and federal law.

(iii)    Defendants purport to impose waiting periods even though such waiting periods are illegal under Colorado and federal law.

(iv)    Defendants fail to provide coverage for treatments and conditions that are mandated benefits under Colorado and federal law.

(v)    Defendants purport to exclude or limit treatments and conditions that are required to be covered under Colorado and federal law.

(vi)    Defendants impose lifetime caps and limits on coverage that are illegal under Colorado and federal law.

(vii)    The benefits booklet, which has never been reviewed or approved by the Colorado Department of Insurance, contains inconsistent and contradictory coverage terms and conditions.  Defendants do not hold a Certificate of Authority to issue insurance in the State of Colorado as required by 10-2-105 C.R.S., yet they market and sell insurance plans to class members.

(d)    Colorado law requires that an insurer maintain certain loss ratios. Defendants' loss ratios do not comply with these law and regulations.  Defendants, in fact, do not maintain enough reserves to protect its members from insolvency.  For-profit Aliera, in fact, takes most of the member premiums as fees.

(e)    Given that the vast majority of the premiums paid are taken by Aliera as fees, the Defendants' program is not a true ministry, but a profit-making enterprise designed to enrich the owners of Aliera.  Consumers were led to believe that their premiums would primarily be used to pay claims of other members.  In fact, most of the contributions were used to pay Aliera and its owners.

(f)    Defendants' advertisements and solicitations of customers for its products is misleading and/or deceptive.  Specifically, the advertisements and solicitation deceive or mislead, or have the capacity to deceive or mislead, members of

the class that they were purchasing an authorized health insurance product. The look and feel of the advertising material suggest that the plan is a health insurance product. Defendants use such things as insurance cards, PPO networks, plan booklets, plan levels, health insurance lexicon (such as "healthcare") to create the impression that they are offering real health insurance benefits.

(g) Online training videos, available to the public and brokers, downplay the ministry aspects of the program and suggest that the program is a form of legitimate healthcare insurance when it is not.

(h) Defendants misrepresent the program as a "sharing" program that provides members with a role in determining whether claims should be paid, when in fact all coverage decisions were made arbitrarily by Aliera, and in Aliera's best interest.

(i) Defendants misrepresent that Trinity, because it is a nonprofit with "nothing to gain or lose financially by determining if a need is eligible or not" is the entity to whom members delegated coverage decision authority. In reality, all coverage decisions were made by Aliera, a for-profit that made substantial profits from not paying health care claims.

80. The deceptive or unfair acts or practices of Defendants occurred in trade or commerce; specifically, the marketing, sale and administration of insurance products to Colorado residents.

81. The public interest element of the CCPA exists here because the business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. The sale of healthcare plans to the public also directly affects the public interest.

82.     Plaintiffs and the class have been injured as a direct result of Defendants'
conduct.  They were sold unregulated insurance products that are illegal under
Colorado law.  The products do not have enough loss ratios to provide protection. The
products provide less coverage than permitted under law, thereby rendering the
policies less valuable than products that do comply with the law.  Plaintiff and the class
have been denied care, or limited in care, due to illegal caps, exclusions and limitations.
Plaintiff and the class have foregone coverage under the ACA, including subsidized
benefit packages that would provide legal, comprehensive, and secure health insurance
coverage.  Defendants' polices were overpriced for the coverage they purported to
provide given that over 80% of the contributions were paid in fees to Aliera, causing
Plaintiff and the class to overpay for the illegal and unregulated policies.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)     Certify that this action may proceed as a class action as defined in
¶16 above;

(b)     Designate Ms. Larson as class representative and designate
Michael David Myers, Myers & Company, PLLC and Victoria Lovato, Michael Best &
Friedrich, as class counsel;

(c)     Declare that Defendants' unauthorized health insurance plans were
and are illegal contracts;

(d)     Declare that Defendants' actions as alleged herein towards the
members of the class violate the Colorado Consumer Protection Act;

(e)     Order Defendants to (i) rescind the unauthorized health insurance
plans and refund all premiums improperly received from members of the proposed
class, including interest; or, at the option of any class member (ii) reform the

unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, permit class members to submit claims for medical services, costs and other expenses that would have been covered;

       (f)    Order payment of all other expenses causally related to Defendants' unfair and/or deceptive acts;

       (g)    Order an award of treble damages under the CCPA;

       (h)    Order payment of reasonable attorneys' fees; and

       (i)    Grant such other relief as this Court may deem just, equitable and proper.

DATED: January 13, 2020.

*s/ Victoria E. Lovato*
Victoria E. Lovato (CO Bar # 31700)
MICHAEL BEST & FRIEDRICH LLP
1776 Lincoln Street, Suite 1100
Denver, CO 80203
Tel. (720) 240-9515
Email: velovato@michaelbest.com


*s/ Michael David Myers*
Michael David Myers
MYERS & COMPANY PLLC
1530 Eastlake Avenue East
Seattle, WA 98102
Tel. (206) 398-1188
Email: mmyers@myers-company.com

Attorneys for Plaintiffs

– 24 –

Case 2:20-cv-00236-RBL   Document 1-2   Filed 02/20/20   Page 26 of 47

# APPENDIX A

IN THE SUPERIOR COURT OF FULTON COUNTY
BUSINESS CASE DIVISION
STATE OF GEORGIA

ALIERA HEALTHCARE, INC.,

    Plaintiff/Counterclaim Defendant,

v.

ANABAPTIST HEALTHSHARE; and
UNITY HEALTHSHARE, LLC,

    Defendants/Counterclaimants,

ALEXANDER CARDONA, and
TYLER HOCHSTETLER,

    Defendants.

CIVIL ACTION FILE NO.
2018CV308981

Business Case Div. 1

## ORDER ENTERING INTERLOCUTORY INJUNCTION
## AND APPOINTING RECEIVER

    The Court has carefully considered the Application for an Interlocutory Injunction and for the Appointment of a Receiver submitted by Defendants-Counterclaimants Anabaptist Healthshare ("Anabaptist") and Unity Healthshare LLC ("Unity") (collectively, "AHS/Unity"), the exhibits and briefs submitted in support, the responses and exhibits submitted by Plaintiff-Counterclaim Defendant Aliera Healthcare, Inc. ("Aliera"), and the evidence and arguments presented at the evidentiary hearing held on January 22, 2019 and January 24, 2019. This Order reduces to writing the oral order and interlocutory injunction of the Court issued at the conclusion of the hearing on January 24, 2019.

    Having allowed the parties several opportunities to confer on a proposed order following the January hearing and having considered the parties' respective submissions and the record, the Court finds and orders as follows:

## I.    FINDINGS OF FACT[1]

**Background**

1.    Defendant/Counterclaimant AHS is a non-profit Section 501(c)(3) tax exempt organization. Affidavit of T. Hochstetler (Hochstetler Aff.) at ¶ 2; Transcript of Hearing on AHS/Unity's Application for Interlocutory Injunction and for Appointment of a Receiver ("Hr'g Tr.") 42:14-18.[2]

2.    AHS has, for some years, managed a Health Care Sharing Ministry ("HCSM") for members of the Anabaptist communities in Virginia. Hochstetler Aff. ¶ 2; Hr'g Tr. 94:18-95:19.

3.    Health care sharing ministries ("HCSM") facilitate the sharing of certain medical expenses among their members. Hochstetler Aff. at ¶ 3; Hr'g Tr. 43:16-44:13.

4.    The Affordable Care Act (the "ACA") exempts members of a qualifying HCSM from the tax penalty levied on those who fail to purchase health insurance, commonly referred to as "the individual mandate." Hochstetler Aff. ¶ 3; Hr'g Tr. 43:16-24.

5.    AHS received a letter from the Centers for Medicare and Medicaid Services ("CMS") stating that it met the ACA's requirements for its members to claim the tax exemption, which included the requirement that AHS has been "in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since December 31, 1999." Hochstetler Aff. ¶ 3; Hr'g Tr. 43:25-44:3.

6.    The United States Department of Health and Human Services certified that AHS is an HCSM whose members qualified for the exemption from the individual mandate. Hochstetler Aff. ¶ 6; Hr'g Tr. 45:1-12; Joint Ex. 2.

7.    AHS's wholly-owned subsidiary, Unity, is also an HCSM whose members qualified for the exemption from the individual mandate to the same extent as AHS. Hr'g Tr. 49:18-50:6.

---

[1]    As demonstrated by the parties' respective proposed findings of fact and other submissions, the evidence adduced to date in this matter is too vast to adequately summarize here. Included herein are the Court's preliminary findings that are most relevant to the Court's rulings and analysis.

[2]    The exhibits cited herein were either received in evidence at the evidentiary hearing on AHS/Unity's motion for interlocutory injunction or are attached to the parties' pleadings and filings in connection with AHS/Unity's motion for a TRO/interlocutory injunction.

8.      AHS was formed in 2015, and Unity was formed in late 2016. Hr'g Tr. 96:7-8; 300:3-5.

9.      Congress eliminated the individual mandate's tax penalty beginning January 1, 2019. *See* Pub. L. No. 115-97, § 11081 (2017); Hr'g Tr. 98:23-99:9.

10.     Georgia's Insurance Code defines a "health care sharing ministry" as "a faith-based, nonprofit organization that is tax exempt under the Internal Revenue Code" and that meets the six specific requirements set forth in the statute. O.C.G.A. § 33-1-20 (providing that HCSMs meeting such requirements are neither insurance nor subject to the jurisdiction of the Commissioner of Insurance).

11.     Other states have similar statutes defining HCSMs. *See, e.g.*, Fla. Stat. § 624.1265(1) (defining a healthcare sharing ministry as "[a] nonprofit religious organization" that satisfies certain requirements); Tex. Ins. Code § 1681.001 ("A faith-based, nonprofit organization that is tax-exempt under the Internal Revenue Code of 1986 qualifies for treatment as a health care sharing ministry…"); Va. Code Ann. § 38.2-6300 ("As used in this chapter, 'health care sharing ministry' means a health care cost sharing arrangement…administered by a non-profit organization that has been granted an exemption from federal income taxation pursuant to § 501(c)(3) of the Internal Revenue Code of 1986…").

12.     Additionally, the federal ACA provision that allowed HCSM members to claim an exemption from the tax penalty of the individual mandate makes clear that an HCSM must be a non-profit federally tax-exempt organization. *See* 26 U.S.C. § 5000A(d)(2)(B) (defining a "health care sharing ministry" as a non-profit tax exempt 501(c)(3) organization that meets certain criteria including having members who share a common set of ethical or religious beliefs and who share medical expenses, and that the HCSM must have been in existence and sharing continuously and without interruption since at least December 31, 1999).

13.     Aliera is an Atlanta-based for-profit company that sells healthcare products. Hochstetler Aff. at ¶ 10; *see also* Hr'g Tr. 48:12-20; 89:1-2. Aliera offers alternative healthcare that is not insurance. Hr'g Tr. 251:1-23; Steele Aff. at ¶2.

14.     As a for-profit company, Aliera does not qualify as an HCSM under state or federal law. *See* Hr'g Tr. 48:12-20; 50:10-17; 52:1-8; 55:17-23; 89:1-2.

3

15.     Aliera began selling its healthcare products in 2015. Hr'g Tr. at 185:5-17. At that time, Aliera's products included services such a direct primary care medical home (DPCMH) service but did not include coverage for emergency room visits and hospitalization. Hr'g Tr. at 50:7-17, 185:5-17; Steele Aff. at ¶ 4.

16.     Before Aliera established a relationship with an HCSM to offer an HCSM product, members who purchased Aliera's products did not qualify for exemption from the individual mandate's tax penalty. In other words, individuals who purchased Aliera's products did not satisfy the ACA's individual mandate unless they also purchased additional healthcare products from another source that satisfied the individual mandate. Hr'g Tr. 186:9-11.

17.     At some point after it began selling its products, Aliera determined that if it could sell its plans side-by-side with an ACA-exempt HCSM plan, it would make the Aliera plan much more attractive to consumers and increase sales of Aliera's own products. Hr'g Tr. 186:12-189:4. Such concurrent offering of non-ACA exempt Aliera products with ACA-exempt AHS/Unity products would not, however, make Aliera's own products satisfy the individual mandate.

## Aliera Approaches AHS and the Parties Negotiate and Execute an Amended MOU and a Written Agreement

18.     To this end, in 2016, Aliera approached AHS to pitch a relationship between Aliera and AHS. Hochstetler Aff. at ¶ 7; Hr'g Tr. 46:4-9.

19.     Timothy Moses, Alexander Cardona, and G. Michael Smith pitched the relationship and negotiated with AHS on behalf of Aliera. Hochstetler Aff. at ¶¶ 7-14; Hr'g Tr. 46:4-47:25; Smith Aff. at ¶¶3-5. Tyler Hochstetler led the negotiations for AHS. Hr'g Tr. 46:4-65:4.

20.     Tyler Hochstetler testified that Aliera representatives proposed an arrangement under which Aliera would work with AHS to build AHS's HCSM network. Hochstetler Aff. at ¶ 8; Hr'g Tr. 46:10-50:3.

21.     Timothy Moses explained to Tyler Hochstetler that Aliera sought to enter into a business relationship with AHS because Aliera could not offer hospitalization coverage through its direct primary

4

care medical home (DPCMH) products, nor could Aliera – as a for-profit company – offer HCSM products by itself. Hr'g Tr. 50:10-17.

22.     Aliera valued AHS's exemption from the individual mandate, and entering into a relationship with AHS would allow Aliera to bundle HCSM plans with its products to offer participants the ability to qualify for the tax exemption from the ACA's individual mandate. Hochstetler Aff. at ¶¶ 11-13; Hr'g Tr. 48:12-20.

23.     Timothy Moses stated that, if the parties were to enter into a business relationship, Aliera would market and administer AHS's HCSM plans. Hr'g Tr. 46:10-18; 49:21-24.

24.     Timothy Moses proposed that AHS/Unity compensate Aliera $25 per member per month as Aliera's fee for the administrative services Aliera performed as part of its business relationship with AHS. Hr'g Tr. 51:14-25. Timothy Moses suggested that this fee was reasonable because it was similar to the fee other HCSMs paid for administrative services. Hr'g Tr. 51:11-25.

25.     AHS asserts it was interested in partnering with Aliera because it desired to expand its ministry, and Aliera presented itself as an experienced and reputable company that could help AHS expand its HCSM nationwide. Hochstetler Aff. at ¶¶ 13-14; Hr'g Tr. at 50:21-50:1.

26.     For example, Aliera represented to AHS that it had a strong compliance strategy and maintained strong relationships with insurance commissioners in every state. According to Tyler Hochstetler, this was extremely important to AHS. Hochstetler Aff. at ¶ 14; Hr'g Tr. 51:2-10.

27.     Following their negotiations, Aliera and AHS executed a Memorandum of Understanding on October 31, 2016. Hochstetler Aff. at ¶ 15.

28.     On November 10, 2016, AHS and Aliera executed an Amended Memorandum of Understanding. Hochstetler Aff. at ¶¶ 16; Hr'g Tr. 55:7-9.

29.     Aliera primarily drafted the Amended Memorandum of Understanding with participation from AHS representatives. Hr'g Tr. 55:15-16; 164:7-20; Smith Aff. at ¶5.

30.     The Amended Memorandum of Understanding contemplated that AHS would create a new nonprofit subsidiary, Unity, to offer HCSM plans. Hochstetler Aff. at ¶ 16.

5

31.     The Amended Memorandum of Understanding further contemplated that Aliera and AHS, through its new subsidiary Unity, would partner to sell two-part healthcare products. It provided that "AHS and [Aliera] wish to cooperate as set forth in this MOU so that the [Aliera] products along with the AHS products are sold side by side and marketed to the public members who are or agree to become members of the faith-based ministry membership and health plan." Joint Ex. 3 at p. 1 (Amended Memorandum of Understanding); Hochstetler Aff. at ¶ 16; Hr'g Tr. 57:5-11.

32.     The Amended Memorandum of Understanding described Aliera's role in Section 2.5(j) as follows: "AHS will contract with [Aliera] to market Unity Healthshare, service memberships, cover claims, handle bill reductions, and generally operate Unity Healthshare, subject to the direction of the board of AHS. [Aliera] will charge an anticipated $25 per member, per month for this service." Joint Ex. 3 at p.3.

33.     The Amended Memorandum of Understanding at Section 1.2 provided in part: "[Aliera] is and shall remain the sole and exclusive owner or authorized licensee of and will retain all right, title, and interest, including all intellectual property rights, in and to the [Aliera] Products, and AHS is and shall remain the sole and exclusive owner or authorized licensor of and will retain all right, title, and interest, including all intellectual property rights, in and to the AHS product offerings, except for the specific licenses granted to [Aliera] or specific grants by [Aliera] to AHS…" Joint Ex. 3 at p.2.

34.     The Amended Memorandum of Understanding also contemplated that the parties would "enter into a more formal understanding and written agreement as quickly as possible . . . to formalize their understanding and agreement." Joint Ex. 3 at p. 1.

35.     On February 1, 2017, Aliera and AHS entered into a written contract ("the Agreement"). Hochstetler Aff. at ¶ 17; Hr'g Tr. 59:4-7; Joint Ex. 4 (Agreement).

36.     Aliera drafted the Agreement although the parties negotiated the terms. Hr'g Tr. 58:23-24, 59:12-14; Smith Aff. at ¶5.

37.     The fourth "Whereas" clause on the first page of the Agreement provides, in relevant part, that AHS and Aliera "have agreed to cooperate and partner together in accordance with the

6

Amended Memorandum of Understanding, whereby the two parties agree to enable ALIERA to market and sell the two part non-insurance products to AHS and ALIERA and/or [Unity] members." Joint Ex. 4 at p. 1.

38.     The fifth "Whereas" clause goes on to state that "AHS and its subsidiary, UHS, wish to market products through ALIERA's DPCMH model of care, network, administration, call center, marketing, plan design, website administration, enrollment portal, concierge services, telemedicine, and other related services, and whereas, AHS and [Unity] do hereby contract with ALIERA to provide said services, in accordance with the terms and conditions contained herein." Joint Ex. 4 at p. 1.

39.     The ninth "Whereas" clause  provides: "AHS is granting ALIERA an exclusive **license to sell and distribute [Unity] products** to the public markets (*pubic markets means persons who will acknowledge the standard of beliefs and other requirements as deemed necessary by AHS*) via all distribution channels…" Joint Ex. 4 at p. 2 (capitalized and italicized emphasis in original; bold emphasis added).  Section 1.2 further provides that AHS, on Unity's behalf, granted Aliera a "U.S. wide, royalty-free, non-transferable, exclusive[] **license**." Joint Ex. 4 at p. 2 (bold emphasis added).

40.     Section 1.3 provides:  "**During the term of this agreement** ALIERA shall remain the sole and exclusive authorized non-insurance health care company allowed to market and sell health care products to ALIERA and Unity HealthShare members.  Aliera will retain all right, title, and interest including all intellectual property rights, in and **to the ALIERA products**, and AHS is and shall remain the sole and exclusive owner or authorized licensor of and will retain all right, title, and interest, including all intellectual property rights, in and to the membership roster, except for the specific licenses granted in Sections 1.2." Joint Ex. 4 at p. 2 (bold emphasis added).

41.     Section 1.4 provides that the "HealthShare offerings [are] to be marketed and sold by Unity HealthShare, LLC."  Joint Ex. 4 at p.2.

42.     Section 7(g) states that "Aliera will design and implement all cost sharing plans, marketing materials, operational controls and general business banking for [Unity] subject to access and approval by the AHS Board of Directors."  Joint Ex. 4 at p. 5.

43. Under Section 7(d), Unity was to escrow $2.00 per member per month from each new membership application into a "ministry fund" to be administered directly by AHS. Joint Ex. 4 at p. 5. Unity also agreed to deposit $25.00 from each one-time application fee per membership to be used by AHS as it deemed most appropriate to further the intent of the ministry and cover administration and related costs. *Id.*

44. Section 7(f) sets forth a "profit-sharing arrangement" whereby Eldon and Tyler Hochstetler each received $2.50 per enrolled member in Unity per month. Joint Ex. 4 at p. 5.

45. Section 4 of the Agreement is entitled "Administrative Fees" and states, in relevant part: "It is agreed that ALIERA shall be entitled to retain the initial enrollment fee, and the first monthly membership fee payment. The second monthly membership fee payment shall also be retained by ALIERA, to be used if necessary for ALIERA or [Unity] expenses. Thereafter, any succeeding month(s) which the membership is continued, ALIERA shall be entitled to retain $25.00 PMPM [*i.e.*, "per member per month"] as payment for its services." Joint Ex. 4 at pp. 3-4. Thus, the parties' Agreement provides Aliera with more compensation than what was contemplated in the Amended Memorandum of Understanding.

46. The Administrative Fees paid to Aliera under Section 4 of the parties' Agreement amounted to millions of dollars. Hr'g Tr. 307:17-308:5.

47. Section 7(l) of the Agreement states that the parties' contract is integrated: "This Agreement contains the entire understanding between the Parties with respect to the subject matter hereof and supersedes all and any prior understandings, undertakings and promises between AHS, [Unity], and ALIERA, whether oral or in writing." Joint Ex. 4 at p. 6.

48. Tyler Hochstetler testified that, during the parties' negotiations concerning the Agreement, Timothy Moses told Tyler that he had retired after building a billion-dollar company. Hr'g Tr. 54:8-55:1.

49. In 2005, a federal jury found Timothy Moses guilty of securities fraud and perjury. *See United States v. Moses*, No. 1:04-cr-508-CAP (N.D. Ga.), at ECF 86. Mr. Moses was sentenced on

8

February 17, 2006 to 78 months' imprisonment followed by a term of five years' supervised release. *Id.* at ECF 96. Soon after his release, Judge Pannell revoked Mr. Moses's supervised release because he had misled his supervising probation officer about his financial affairs and failed to disclose bank account information and new lines of credit. *Id.* at ECF 145 & 150. Mr. Moses's supervised release was terminated in April 2015 (*see id.* at ECF 167), approximately six months prior to Aliera's creation and approximately one and a half years prior to Aliera and Mr. Moses approaching AHS and Mr. Hochstetler about forming a relationship.

      50.     Tyler Hochstetler testified that he learned about Tim Moses' criminal conviction in the "first half" of 2017. Hr'g Tr. 151:21-24.

**The Parties' Business Relationship**

      51.     Aliera offered its products to the public in conjunction with the Unity HCSM plans. Hochstetler Aff. at ¶ 19; Hr'g Tr. 107:8-20.

      52.     Individuals and families who purchased a Unity HCSM plan could claim an exemption from the tax penalty of the ACA individual mandate. Hochstetler Aff. at ¶¶ 12, 19; Hr'g Tr. 50:4-6

      53.     The marketing materials for the side-by-side plan offerings emphasized the Unity HCSM exemption from the tax penalty of the ACA's individual mandate. Hr'g Tr. 188:22-189:18.

      54.     Members interfaced with Aliera with respect to both plans because Aliera served as the program administrator for the Unity HCSM plans under the Agreement. Hochstetler Aff. at ¶ 20.

      55.     Unity entrusted Aliera with Unity HCSM member information and the Unity HCSM plan assets. Hochstetler Aff. at ¶ 20; Hr'g Tr. 80:21-81:4.

      56.     Some individuals purchased plans that contained only an Aliera product and some individuals purchased plans that contained only a Unity HCSM product. The vast majority of individuals, however, purchased plans that contained two separate products: an Aliera DPCMH product and a Unity HCSM product. Hr'g Tr. 188:13-189:18. Though those plans were offered side by side, Aliera represented to third parties during the course of its relationship with AHS/Unity, consistently with the fact that only the Unity HCSM was ACA exempt, that the plans were legally separate and distinct. *See*

9

Corresp. to Fla. Office of Ins. Reg., Joint Ex. 6 at pp. 1-2; Corresp. to Maryland Ins. Comm'r, Joint Ex. 1 at p. 2.

57.     The separate and distinct nature of the Unity HCSM plans is also reflected in the Member Guide admitted into evidence, which was drafted by Aliera. Joint Ex. 5; Hr'g Tr. 65:25-66:12.

58.     The Member Guide delineates between the Aliera component and the Unity HCSM component of the combined plans. For example, the Member Guide distinguishes between "Aliera Healthcare services and Unity HealthShare cost sharing," which "combine to create a full range of services and benefits." Joint Ex. 5 at p. 4. Part I of the Member Guide relates to information about Aliera's products. Part II of the Member Guide relates to the Unity HCSM. *See generally* Joint Ex. 5.

59.     Part II of the Member Guide makes clear that the HCSM is a Unity HealthShare plan and that the members of such plan are Unity HealthShare members. For example, Part II begins by describing Unity HealthShare as "a health care sharing ministry (HCSM) which acts as an organizational clearing house to administer sharing of health care needs for qualifying members." *Id.* It also outlines certain criteria that individuals must meet in order to "become and remain a member of Unity HealthShare." *Id.* at p. 11. The Member Guide also states that "[m]embers wishing to change to a membership type other than that in which they are currently participating may, at the discretion of Unity HealthShare, be required to submit a new signed and dated membership application for review." *Id.* at p. 12. And page 13 of the Member Guide defines the term "Membership" as "[a]ll members of Unity HealthShare." *Id.* at p. 13. Monthly contributions are defined as monetary contributions "voluntarily given to Unity HealthShare to hold as an escrow agent and to disburse according to the membership escrow instructions." *Id.* at p. 14. These are just a few examples of how Part II of Member Guide defines the HCSM plan as a Unity product, separate and distinct from the Aliera product.

60.     Moreover, the Member Guide requires members to seek resolution of any disputes concerning their HCSM plan with Unity, *not* Aliera. *See id.* at p. 17. The Dispute Resolution and Appeal section of the Member Guide outlines the various steps that a member must take to challenge determinations made by the HCSM. The first level of appeal asks the member to "call[] Unity

10

Healthshare," which "will try to resolve the matter within ten (10) working days in writing." *Id.* The second level of appeal is to an "Internal Resolution Committee, made up of three Unity HealthShare officials." *Id.* The third level of appeal is to submit the dispute to "three sharing members in good standing and randomly chosen by Unity HealthShare." *Id.*

61.    If the various levels of appeal do not result in a resolution that is satisfactory to the member, then the member must pursue the claims through a mediation and arbitration with Unity HealthShare. The Member Guide states that "Unity HealthShare shall pay the fees of the arbitrator in full and all other expenses of the arbitration." *Id.*

62.    Aliera is not referenced in the dispute resolution provision in Part II for the HCSM plan.

63.    The Member Guide also expressly accords Unity, not Aliera, with exclusive subrogation rights for amounts paid or found to be payable by an institutional source or a liable third party, which further evidences that the HCSM plans belonged to Unity, not Aliera. *Id.* at p. 19.

64.    Consistent with the Member Guide, during the course of the parties' relationship, Aliera described itself to regulators as a third-party administrator of the Unity HCSM plans. For example, Aliera explained to the Maryland Insurance Commissioner that "as a program administrator for Unity plans, Aliera is exempt from Maryland licensing laws because Aliera does not market insurance in Maryland." Corresp. to Maryland Ins. Comm'r, Joint Ex. 1 at p. 2.

65.    Tyler Hochstetler testified that AHS/Unity understood that, under the parties' Agreement, member funds collected for Unity products were to be segregated in a separate account that belonged to Unity. Hr'g Tr. at 70:14-17.

66.    Tyler Hochstetler also testified that AHS/Unity trusted that Aliera would properly account for Unity HCSM plan assets and that Aliera would keep the Unity HCSM plan assets separate from Aliera's funds. Hr'g Tr. 80:21-81:4.

67.    Aliera represented to third parties, such as the Florida Office of Insurance Regulation, that it was in fact segregating the Unity HCSM plan assets from other funds. Specifically, a law firm retained by Aliera to represent it in proceedings before the Florida Office of Insurance Regulation stated

11

in September 2017 that "Aliera provides and maintains the portal used by members to purchase products. Funds collected through the portal for Unity products are disbursed directly to Unity Healthshare. Likewise, funds collected through the portal for Aliera products are disbursed directly to Aliera." Corresp. to Fla. Ins. Comm'r, Joint Ex. 6 at 1. Aliera also stated in its Motion to Reconsider that "[a]ll of the [Unity HCSM plan members'] money – in the form of payments to Aliera, to Trinity, to Unity, and payments from those entities to providers – can be traced." Aliera's Motion to Reconsider at 8 (Jan. 2, 2019).

68. Tyler Hochstetler testified that in January 2018, he learned for the first time that Aliera was not properly segregating the Unity HCSM plan assets. According to Tyler Hochstetler, Timothy Moses stated at a January 2018 meeting of the AHS Board that Aliera had not segregated the Unity HCSM plan assets, but instead unilaterally allocated revenues in the manner in which Aliera saw fit, keeping as much of the incoming member funds for Aliera's own benefit as it desired. Hr'g Tr. 71:10-16; 79:20-80:10.

69. Tyler Hochstetler testified that Aliera did not have AHS/Unity's permission or authorization to treat member funds in this way, and that AHS/Unity never authorized Aliera to place Unity funds into Aliera accounts or to use Unity funds for Aliera's own purposes. Hr'g Tr. 70:21-24 & 80:14-20.

70. The evidence shows that, per Timothy Moses' admissions to AHS/Unity, the representations that Aliera made to the Florida Office of Insurance Regulation about the way it treated Unity HCSM plan funds were incorrect. Indeed, Aliera's Comptroller, James F. Butler, III, acknowledged at the interlocutory injunction hearing in this case that member contributions associated with the Unity HCSM plans were not sent directly to Unity Healthshare. Hr'g Tr. at 334:6-335:4. Rather, Mr. Butler testified that: payments were received by Aliera and deposited into an account; when transactions occurred Aliera transferred money to pay for the claims; and later there would be a monthly reconciliation whereby contribution payments were segregated into Aliera and Unity accounts. Hr'g Tr. 331:21-333:13.

12

71.     On May 4, 2018, Unity also learned that Timothy Moses had written approximately $150,000 dollars in checks to himself out of the Unity operating account without AHS/Unity's knowledge or authorization. Hochstetler Aff. at ¶ 28; Hr'g Tr. 83:5-86:3.

72.     Tyler Hochstetler testified that after learning that the Unity HCSM plan assets were not being properly segregated, AHS/Unity took immediate steps to secure the integrity of its funds. Hr'g Tr. 81:5-12.

73.     AHS/Unity first demanded an accounting of Unity funds so that AHS/Unity could assess whether Aliera was handling Unity HCSM plan assets appropriately. Hr'g Tr. 81:5-12. Aliera did not provide Unity with an accounting. Hochstetler Aff. at ¶¶ 24-25.

74.     On July 25, 2018, AHS/Unity instructed Aliera to turn over control of Unity funds to Unity immediately and directed Unity HCSM plan members to make future payments to Unity. Hr'g Tr. at 81:13-22. Aliera did not comply with either of these demands, and continued to collect funds associated with the Unity HCSM component of member plans. Hr'g Tr. at 83:2-4; 195:2-23.

75.     AHS/Unity has presented evidence that it became increasingly concerned about Aliera's administration of its plans during the summer of 2018. It was particularly troubled by Aliera's repeated refusals to disclose information about the Unity HCSM plans that Aliera had assumed complete control over. Hochstetler Aff. at ¶¶ 24-26; Hr'g Tr. 79:20-86:17.

76.     Tyler Hochstetler testified that given Timothy Moses's criminal history, Mr. Moses's taking funds from the Unity operating account, and Aliera's refusal to disclose complete financial information, he and other AHS Board members became seriously concerned that the Unity HCSM plan assets were at risk of misappropriation. Hochstetler Aff. at ¶ 24-29; Hr'g Tr. 79:20-86:17.

77.     Tyler Hochstetler testified that AHS/Unity removed Timothy Moses and Shelley Steele from certain Unity bank accounts as signers and ultimately froze two accounts containing approximately $5 million in funds used to pay claims. Hr'g Tr. 82:21-83:4, 147:8-149:24.

13

**AHS/Unity Terminates the Agreement**

78.    With respect to termination, Section 3 of the Agreement provides:

This Agreement will commence on the Effective Date and will remain in effect perpetually after the execution date of this [A]greement, unless terminated or modified earlier by mutual agreement or substantial, material breach of this contract. However, upon termination, any existing member plans will remain active until the member's next renewal date.

**Upon termination of this Agreement, all licenses granted hereunder shall immediately terminate, and the Parties will promptly destroy or return all materials in its possession which belong to the other Party, including any and all confidential information which may have come into its possession**. In the event of any termination of this Agreement, Sections 2, 3.2 and 4., 5. and 6. will survive in accordance with their terms.

Joint Ex. 4 at p. 3 (bold emphasis added).

79.    On August 10, 2018, following a failed mediation with Aliera, AHS terminated the Agreement. Hochstetler Aff. at ¶ 30; Hr'g Tr. 86:18-19, 146:14-20.

80.    AHS/Unity's termination included an express revocation of Aliera's right to hold the Unity HCSM plan funds and demanded that Aliera return control over those funds to AHS/Unity. Hr'g Tr. 89:12-21; 179:17-23. Aliera disagreed and did not turn over the Unity HCSM plan funds. Hr'g Tr. 89:19-21.

81.    AHS/Unity sought to have Aliera provide it with the Unity HCSM membership roster. Hr'g Tr. 88:16-22. Aliera disagreed and did not provide the Unity HCSM membership roster to AHS/Unity. Hr'g Tr. 88:16-22.

82.    Aliera retained possession of the Unity membership roster, all of the Unity HCSM plans, all of the Unity HCSM plan assets, Unity's intellectual property, including the Unity website, and Unity's employees. Hr'g Tr. 88:11-22.

83.    Tyler Hochstetler testified that Aliera's retention of the financial information concerning the Unity HCSM plans has prevented AHS/Unity from completing its 2017 and 2018 audits, which are necessary to retain Unity's status as a HCSM. Hr'g Tr. 91:13-92:5; 92:12-19.

14

84.     AHS/Unity's inability to complete its audit jeopardizes its status as a tax exempt and ACA-approved HCSM. Hr'g Tr. 91:13-92:16.

85.     Tyler Hochstetler testified that if AHS/Unity's HCSM status as an ACA-approved HCSM is lost, it may become very difficult to recover, as HCSMs must share healthcare expenses of its members continuously and without interruption from 1999 to the present. Hr'g Tr. 92:6-11.

86.     Tyler Hochstetler testified that Aliera has prevented AHS/Unity from doing business with a key vendor. Hr'g Tr. 90:6-20.

87.     After termination of the Agreement, Aliera retained the entirety of the Unity HCSM plans' member base for itself. Hr'g Tr. 90:6-12.

88.     After termination of the Agreement, Aliera continued to maintain control over Unity's website and refused Unity's claims to it. Hr'g Tr. 91:2-12.

89.     The testimony at the hearing demonstrates that Aliera continues to controls the Unity website, www.unityhealthshare.org and www.unityhealthshare.com. Aliera has configured those website so that when a member visits them, the member is automatically redirected to the website of Trinity Healthshare ("Trinity"). Hr'g Tr. 91:2-12.

90.     In 2018, Unity changed its name to Kingdom Healthshare. Mr. Cardona testified that Unity decided to change its name to Kingdom Healthshare in part because Aliera maintained control of the Unity HCSM plans and Unity's website. Hr'g Tr. 170:22-25; 195:24-198:6.

**Change from Unity HSCM to Trinity HCSM**

91.     On November 15, 2018, Aliera sent a notice to all Unity HCSM members. Joint Ex. 9.

92.     Aliera's November 15, 2018 notice stated "***No Action is Needed***" in bold italics font, near the top of the notice. Joint Ex. 9.

93.     Aliera's November 15, 2018 notice announced that it would transition all Unity HCSM members to Trinity on January 1, 2019. Joint Ex. 9.

94.     Trinity was created in 2018 by Aliera and its principals. Its Chief Executive Officer is William H. ("Rip") Thead, III, a former Aliera employee. Hr'g Tr. 300:8-16. Mr. Thead is a Moses

15

family friend who officiated Chase Moses's wedding. Hr'g Tr. 300:19-23. Chase Moses testified that Trinity is a 501(3)(c) and that it is "based on the Baptist faith." Hr'g Tr. 301:2-302:20.

95.     The November 15, 2018 notice stated in part: "Beginning January 1st, 2019 Aliera is excited to announce Trinity HealthShare as its new Healthcare Sharing Ministry (HCSM) partner…All plan features, including eligible medical services, Member Shared Responsibility Amount ("MSRA"), and monthly member contribution amounts (how much you are billed each month) will remain the same. You also retain access to the same network providers and facilities with the same discounts. ***Nothing changes on your plan except for the HCSM name. You don't have to do anything to maintain your current plan.*** You will retain your Member ID number and continue to contact Aliera Member Services for any assistance you may need regarding your membership. You will receive an updated plan membership card. All contact and processing information remains the same. If for any reason, you wish not ***to continue*** with your AlieraCare 5000 – Premium Plan Plan, [sic] you may opt-out by clicking here to complete a member cancellation form. An Aliera representative will follow up with you promptly to process your request." Joint Ex. 9 (emphasis added).

96.     Unity HCSM members had to take affirmative action to opt out of the transition of their plans from Unity plans to Trinity plans.

97.     Trinity is a separate and distinct entity from Unity Healthshare. Trinity is in no way affiliated with Unity. Hochstetler Aff. at ¶ 34; Hr'g Tr. 91:10-12.

98.     Trinity was created in Delaware on June 26, 2018, and authorized to conduct business in Georgia on October 26, 2018. Joint Ex. 10.

99.     The November 15, 2018 notice made no mention of Unity, or the fact that Unity had terminated its Agreement with Aliera. Joint Ex. 9.

**The Court's TRO**

100.     On December 28, 2018, the Court entered a Temporary Restraining Order, which – in part – enjoined Aliera from "transitioning any Unity HCSM members and plan assets to Trinity HealthShare LLC while this Temporary Restraining Order is in effect."

16

101.    The Temporary Restraining Order also required Aliera to "use electronic means to notify as many Unity HSCM plan members as possible by January 1, 2019, that they will not automatically move to Trinity effective January 1, 2019, as previously stated in Aliera's November 15, 2018 electronic correspondence . . ."

102.    Aliera, however, did not send this notice out to Unity HCSM members until two days after denial of its motion to reconsider the Court's TRO, on January 10, 2019. Hr'g Tr. 312:1-8.

## II.    CONCLUSIONS OF LAW

Under Georgia law, a court may enter an interlocutory injunction "to maintain the status quo, if, after balancing the relative equities of the parties, it appears the equities favor the party seeking an injunction." *Bernocchi v. Forcucci*, 279 Ga. 460, 461, 614 S.E.2d 775, 777 (2005).

In weighing the relevant equities, the Court considers the following factors:

(1) whether there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted;

(2) whether the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined;

(3) whether there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial;

(4) whether granting the interlocutory injunction will not disserve the public interest.

*Bishop v. Patton*, 288 Ga. 600, 604, 706 S.E.2d 634, 638 (2011). These factors guide the Court's weighing of the equities, but "a party seeking interlocutory injunctive relief need not always 'prove all four of these factors.'" *SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 5 n. 7, 709 S.E.2d 267, 271 (2011).

As an initial matter, in weighing the relevant equities on the facts presented here, the Court finds instructive the Georgia Supreme Court's decision in *Grossi Consulting, LLC v. Sterling Currency Grp., LLC*, 290 Ga. 386, 722 S.E.2d 44 (2012). In that case, the Supreme Court affirmed an interlocutory injunction where the moving party's former contractor – initially hired to create a website and technology infrastructure to aid the movant's business – held the movant's assets after termination of the parties'

17

business relationship. *Id.* The Supreme Court found that because the former contractor had gained control of the movant's assets by virtue of the parties' business relationship, the Court did not abuse its discretion in ordering the contractor to relinquish control of those assets. *Id.* The contractor's continued possession of the movant's assets threatened dissipation of the assets during litigation. *Id.*

In this case, and as more fully set forth below, the evidence shows that AHS/Unity is substantially likely to succeed on its claim that it held all rights to the Unity HCSM plans and that Aliera serviced those plans solely as a third-party administrator under the parties' Agreement. *See* Findings of Fact ("FOF") at ¶¶ 23-24, 54-56, 64. The evidence further shows that, as in *Grossi*, Aliera had substantial control over the Unity HCSM plan assets by virtue of the parties' Agreement and Aliera's role as an administrator of the Unity HCSM plans. FOF at ¶¶ 55, 65-66, 87-90. And, most importantly, the evidence shows that Aliera has taken actions to misappropriate those assets; namely, by unilaterally attempting to transition the Unity HCSM plans to Trinity. FOF at ¶¶ 91-99.

An interlocutory injunction is legally appropriate to prevent Aliera from transitioning all Unity plan members and plan funds to a new HCSM, and to protect those funds from misappropriation and waste pending a final resolution on the merits. Moreover, the terms of the interlocutory injunction – enjoining the transition of Unity HCSM members to Trinity coupled with a receivership – are less intrusive than in *Grossi* where the court ordered a transfer of all disputed assets to the movant. Accordingly, the Court finds that the Georgia Supreme Court's decision in *Grossi* governs the propriety of granting an interlocutory injunction under the circumstances presented here.

Moreover, upon consideration of the parties' briefing, the exhibits attached thereto, and the evidence adduced at the hearing, the Court finds that each equitable factor weighs in favor of an interlocutory injunction in this case.[3]

___

[3] To the extent Defendants argue Section 2.4 of the Agreement forecloses injunctive relief, the Court disagrees. That section provides:

> EXCEPT FOR (i) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 6. AND (ii) A PARTY'S INDEMNITY OBLIGATIONS SET FORTH IN SECTION 5. **NEITHER PARTY WILL BE**

18

**Likelihood of Success on the Merits**

The Court finds that AHS/Unity is likely to succeed on its claim for breach of the parties'
Agreement. While the Court is not making a final determination regarding contract interpretation at this
time nor deciding the parties' claims seeking declaratory relief, the Court preliminarily concludes for
purposes of deciding this interlocutory injunction that a fair reading of the Agreement is that the Unity
HCSM plans belonged to AHS/Unity with Aliera administering the Unity HCSM plans as consideration
for the administrative fees provided for under the Agreement. FOF at ¶¶ 45-46. This interpretation is
consistent with the statutory requirements for HCSMs like Unity. The Court finds that there is a
substantial likelihood that AHS/Unity will succeed on the merits of its declaratory judgment claim and its
claim that Aliera's treatment of the Unity HCSM plans and its retention of the Unity HCSM plans and
plan assets after termination of the parties' contract was a material breach of the parties' Agreement.
Unity is also likely to succeed on the merits of its breach of fiduciary duty claim.

First, AHS/Unity is likely to succeed on its declaratory judgment claim that the Agreement

---

> **LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTLY,
> SPECIAL, OR PUNITIVE DAMAGES** ARISING OUT OF THIS AGREEMENT,
> WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT, AND
> REGARDLESS OF WHETHER EITHER PARTY HAS BEEN ADVISED OF THE
> POSSIBILITY OF ANY SUCH LOSS OR DAMAGE THIS SECTION DOES NOT
> LIMIT EITHER PARTY'S LIABILITY FOR BODILY INJURY (INCLUDING
> DEATH), OR PHYSICAL DAMAGE TO TANGIBLE PROPERTY.
> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,
> EXCEPT AS PROVIDED FOR A BREACH OF SECTION 4.1 (CONFIDENTIALITY
> OBLIGATIONS) OR EXCEPT AS PROVIDED UNDER SECTION 2.5 (INDEMNITY
> OBLIGATIONS), **IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY
> TO THE OTHER PARTY IN CONNECTION WITH, ARISING OUT OF OR
> RELATING TO THIS AGREEMENT EXCEED $5,000 (USD).** THE PARTIES
> AGREE THAT THE LIMITATION SPECIFIED IN THIS SECTION WILL APPLY
> EVEN IF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT IS FOUND
> TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

Joint Ex. 4 at p. 3 (capitalized emphasis in original; bold emphasis added). The foregoing section plainly describes "liability" in terms of damages and limits the parties' entitlement to monetary relief. However, it does not address injunctive or other equitable relief, much less do so explicitly, prominently clearly and unambiguously. *See Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 644–45, 490 S.E.2d 124, 128 (1997) ("Provisions severely restricting remedies act as exculpatory clauses and therefore should be explicit, prominent, clear and unambiguous") (citation and punctuation omitted); *2010-1 SFG Venture LLC v. Lee Bank & Tr. Co.*, 332 Ga. App. 894, 898, 775 S.E.2d 243, 248 (2015) ("[B]ecause exculpatory clauses may amount to an accord and satisfaction of future claims and waive substantial rights, they require a meeting of the minds on the subject matter and must be explicit, prominent, clear and unambiguous") (citation and punctuation omitted).

19

provides that AHS/Unity holds the rights to the Unity HCSM plans, and that Aliera has breached the

Agreement in how it has treated the Unity HCSM plans and plan assets as its own. As summarized in

*Scrocca v. Ashwood Condo. Ass'n, Inc.*, 326 Ga. App. 226, 756 S.E.2d 308 (2014):

> [C]ontract construction proceeds in a series of steps, moving from one to the next
> only if necessary. The construction of contracts involves three steps. At least
> initially, construction is a matter of law for the court. First, the trial court must
> decide whether the language is clear and unambiguous. If it is, the court simply
> enforces the contract according to its clear terms; the contract alone is looked to
> for its meaning. Next, if the contract is ambiguous in some respect, the court
> must apply the rules of contract construction to resolve the ambiguity. Finally, if
> the ambiguity remains after applying the rules of construction, the issue of what
> the ambiguous language means and what the parties intended must be resolved
> by a jury….
>
> When courts construe contracts, the primary purpose is ascertaining the parties'
> intent: [C]ourts should ascertain the parties' intent after considering the whole
> agreement and interpret each of the provisions so as to harmonize with the others.
> That is, in construing contracts, it is important to look to the substantial purpose
> which must be supposed to have influenced the minds of the parties, rather than
> at the details of making such purpose effectual.

*Id.* at 228-29 (citations omitted).

Here, Section 1.3 of the Agreement states, in part, that "AHS is and shall remain the sole and

exclusive owner or authorized licensor of and will retain all right, title, and interest, including all

intellectual property rights, in and to the membership roster, except for the specific licenses granted in

Sections 1.2." Agreement, Joint Ex. 4 at p. 2. Upon consideration of two days of testimony from six

witnesses and the voluminous evidence and briefing submitted by the parties, the Court finds that

AHS/Unity is likely to succeed on its claim that the parties' Agreement provides that Unity, and not

Aliera, is the owner of the Unity HCSM plans and plan assets.[4] A fair reading of the Agreement is that

---

[4]     The Court rejects Aliera's argument that such a construction of the Agreement violates federal antitrust
laws. Accepting AHS/Unity's construction of the Agreement does not allocate customers between horizontal
competitors as Aliera suggests. Indeed, Aliera and Unity are not horizontal competitors because only Unity is a non-
profit organization and therefore only Unity can qualify as an HCSM under Georgia law, federal law, and the laws
of numerous other states. Because Aliera cannot compete with Unity for HCSM members, there is no basis for a
claim of an antitrust violation. *See Ad-Vantage Tel. Directory Consultants v. GET Directories Corp.*, 849 F.2d
1336, 1346 (11th Cir. 1987) ("[T]here can be no antitrust violation without a competitor, and agents do not compete
with those whom they represent"). Even if Aliera and AHS/Unity, through their affiliates, currently "compete" in the
HCSM market, such does not change the Court's analysis. As noted above, a fair reading of the Agreement is that
AHS/Unity granted Aliera a license to market and sell the Unity HCSM plans, not that AHS/Unity was "allocating"
customers to a competitor.

AHS/Unity granted Aliera a license to market and sell the Unity HCSM plans. As the party with authority to grant a license to market and sell the plans, AHS/Unity is substantially likely to be able to demonstrate that it is the plan owner. Moreover, Section 1.4 of the Agreement confirms that the "Healthshare offerings" are "to be marketed and sold by Unity HealthShare, LLC." Aliera's role in the parties' relationship is delineated in Section 7(g) of the Agreement, which provides that "ALIERA will design and implement all cost sharing plans, marketing materials, operational controls and general business banking for [Unity] for its operation of Unity HealthShare, subject to access and approval by the AHS Board of Directors."

Aliera's compensation structure under the Agreement is further evidence that AHS/Unity's reading of the contract is substantially likely to be correct. Section 4 of the Agreement entitles Aliera to "Administrative Fees" on a per member per month basis. FOF at ¶45. Aliera has received millions of dollars in administrative fees. FOF at ¶ 46. Through Section 4, AHS/Unity and Aliera agreed that Aliera would be paid substantial administrative fees for administering the Unity HCSM plans. Such a provision is wholly consistent with administration, not ownership.

Moreover, AHS/Unity's reading of the contract is consistent with the nature of the parties' business relationship. The testimony reveals that only AHS/Unity, not Aliera, is a recognized HCSM. Indeed, Aliera, as a for-profit company, cannot qualify as an HCSM. *See, e.g.*, O.C.G.A. § 33-1-20 (defining an HCSM as "a faith-based, nonprofit organization that is tax exempt under the Internal Revenue Code" which meets the six specific requirements set forth in the statute).[5] FOF at ¶¶ 10-14. Thus, it makes sense that AHS/Unity, and not Aliera, would retain the right to the Unity HCSM plans and plan assets after termination of the Agreement. Further, Aliera represented to, *e.g.*, the Maryland Insurance Commissioner that it acted as an administrator for the Unity HCSM plans, nothing more. FOF

---

[5]      *See also* Fla. Stat. § 624.1265(1) (defining a healthcare sharing ministry as "[a] nonprofit religious organization" that satisfies certain requirements); Tex. Ins. Code § 1681.001 ("A faith-based, nonprofit organization that is tax-exempt under the Internal Revenue Code of 1986 qualifies for treatment as a health care sharing ministry…"); Va. Code Ann. § 38.2-6300 ("As used in this chapter, 'health care sharing ministry' means a health care cost sharing arrangement…administered by a non-profit organization that has been granted an exemption from federal income taxation pursuant to § 501(c)(3) of the Internal Revenue Code of 1986…").