## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

|  |  |  |
|---|---|---|
| REBECCA SMITH; ELLEN LARSON; JUSTINE LUND; and JAIME and JARED BEARD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE ALIERA COMPANIES, INC.; formerly known as ALIERA HEALTHCARE, INC., a Delaware corporation; TRINITY HEALTHSHARE, INC., a Delaware corporation; ONESHARE HEALTH, LLC, formerly known as UNITY HEALTHSHARE, LLC and as KINGDOM HEALTHSHARE MINISTRIES, LLC, a Virginia limited liability corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>1:20-cv-02130-NYW |

## MOTION TO DISMISS OR TO COMPEL ARBITRATION

Defendant The Aliera Companies Inc. ("Aliera") moves this Court to dismiss Plaintiffs' Complaint without prejudice because Plaintiffs have not complied with a condition precedent to bringing this suit -- a contractual obligation to mediate their claims with Defendants. In the alternative, all of Plaintiffs' claims should compelled to arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 2-4, and should then either be stayed under 9 U.S.C. § 3 or dismissed under Rule 12(b)(3) of the Federal Rules of Civil Procedure.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A.   The Nature of Unity's HCSM and Aliera's Role In Administering It.

Unity and Trinity are non-profit healthcare sharing ministries ("HCSM") comprised of members who adhere to a faith-based statement of beliefs. (Decl. of K. Kromodimedjo, ¶¶ 9, 23

(attached as Ex. A).)  Historically, HCSMs are not considered insurance, and instead function as faith-based alternatives to traditional insurance.  They offer a framework for individuals to freely associate with others who share a set of faith principles and to direct their contributions to a pool, in which members may share in the payment of other members' medical expenses.  (*Id.*)  In a certain sense, the HCSM structure is a formalized, special-purpose version of "passing the plate," which many churches have long endorsed as a way to help others with medical needs.

The HCSM structure differs from traditional insurance in several respects.  The chief difference, as Unity and Trinity explained to their members in the Member Guides, is that neither Unity nor Trinity ever assumed any contractual obligation (and took no responsibility) to pay for any member's medical expenses from their own funds.  (Decl. of K. Kromodimedjo, ¶¶ 9, 23.)[1] Nor is there any guarantee that any specific member's requests for sharing will be paid out of other members' health sharing contributions.  (*Id.*)  Unity and Trinity, in essence, both act merely as clearinghouses for their members to share each other's medical expenses.  (*Id.*)

Aliera is not an HCSM and does not purport to be one.  It is a for-profit entity that either directly or through its subsidiaries contracted with Unity and Trinity to market memberships in the Unity and Trinity HCSMs and to create processes to facilitate member-to-member sharing of medical expenses.  Aliera has created a system that is designed to afford members the ability to consent to their contributions being shared on a real-time, case-by-case basis with other members as their needs arise.  (*See* Decl. of K. Kromodimedjo, ¶¶ 4-5.)  But, as previously noted, all

---

[1] *See Altrua Healthshare, Inc. v. Deal*, 299 P.3d 197, 201 (Idaho 2013); *Barberton Rescue Missions, Inc. v. Ins. Div. of the Iowa Dep't of Commerce*, 586 N.W. 2d 352, 356 (Iowa 1998) (both cases holding that "insurance" was not involved because the entity involved assumed no risk of paying members' claims).

2

members are informed that their requests for sharing payments may not be met – there are no guarantees.  (*Id.*, ¶¶ 9, 23.)

B.    **The Plaintiffs' Core Allegations.**

Rebecca Smith, Ellen Larson, Justine Lund, and Jamie and Jared Beard brought this case on behalf of themselves and a putative class of Colorado residents.  They launch a broad-scale attack on both Unity and Trinity's HCSMs.  (*See* Doc. 6.)  They assert that neither qualifies as a valid HCSM because neither complied with federal law governing such programs.  (*Id.* ¶¶ 16-17.) As a result, applying some sort of default rule, Plaintiffs allege that this qualification failure makes these two HCSMs illegal health insurance.  (*Id.* ¶ 18.) They also accuse Aliera of various improprieties in the marketing, sale, and administration of these allegedly illegal insurance plans. (*Id.* ¶¶ 18-22.)

Plaintiffs also point to a close association between Aliera, on the one hand, and Trinity and Unity, on the other.  Plaintiffs allege that Unity "delegated all authority and responsibility to Aliera to create, design, market, and administer products sold under the Unity name." (*Id.* ¶ 39.)  They claim that Aliera "convinced" Unity's parent to create Unity.  (*Id.* ¶ 14.)  They allege that all member contributions were paid directly to Aliera, which maintained complete control over payments for medical expenses and the membership list. (*Id.* ¶ 132.) They allege that "Aliera signed an Agreement with Trinity in which Trinity delegated to Aliera the authority to create, market, sell, and administer the purported HCSM plans under Trinity's name."  (*Id.* ¶ 51.) Plaintiffs then allege that Aliera used "Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster." (*Id.*)  Plaintiffs next allege that Trinity gave Aliera "authority to provide accounting staff, financial and membership

reporting, and audit and tax filing support." (*Id.*)  Finally, Plaintiffs allege that all of Trinity's members' contributions were "made directly to Aliera." (*Id.*)

       **C.**    **The Plaintiffs' Experiences With Unity and Trinity's HCSMs.**

      Smith, Larson, and the Beards originally enrolled in Unity's HCSM in 2018.  (Decl. of K. Kromodimedjo ¶¶ 6, 13, 27.)  Each received the Unity Member Guides, and each made sharing contributions to Aliera for the benefit of Unity's HCSM.  (Decl. of K. Kromodimedjo ¶¶ 6, 8, 13, 15, 27, 28.)  The Beards eventually ended their memberships with Unity and enrolled in Trinity's HCSM in 2019.  (*Id.* ¶ 29.)  Lund joined Trinity's HCSM effective February 1, 2019, and received the Member Guide upon joining. (*Id.* ¶ 20; Doc. 6 ¶ 120.) The Beards and Lund made monthly sharing contributions to Aliera for the benefit of Trinity's HCSM.  (*Id.* ¶¶ 22, 30.)

      While a member of either Unity or Trinity's HCSMs, the Plaintiffs submitted sharing requests to cover medical expenses, and now claim those requests were denied in whole or in part. (Doc. 6 ¶¶ 95, 108, 116, 124)  None of the Plaintiffs are current members of either Unity or Trinity's HCSMs.  (Doc. 6 ¶¶ 106; 116; Decl. of K. Kromodimedjo ¶¶ 7, 14, 21, 30.)

       **D.**    **The Unity And Trinity Healthcare Membership Guides.**

      As previously mentioned, Plaintiffs allege that they were at one time Unity or Trinity members. Plaintiffs concede that, as members, they received Member Guides for plans offered by Unity and Trinity and sold by Aliera.  (Doc. 6 ¶¶ 91, 102, 115, 120.)[2]  These Member Guides imposed several obligations on the members' part, the most pertinent of which at this juncture is complying with the dispute resolution procedures found in those Guides.   (Decl. of K. Kromodimedjo ¶¶ 10, 17, 24, 32.)  Trinity Members, for example, agreed that "**any dispute** [they]

---

[2] Plaintiffs refer to these Member Guides (either directly or indirectly) throughout the Complaint.  (*See* Doc. 6 at ¶¶ 54, 58, 64, 66, 79, 91, 102, 115, 120.)

have with or against Trinity HealthShare, **its associates**, or employees will be settled using the following steps of action, and only as a course of last resort." (*Id.*) (emphasis added); *see also* Doc. 6 at ¶ 132 -- recognizing existence of Member Guide's mediation and arbitration requirements.)  These include, in basic terms:

- 1st Level Appeal (telephone call with Trinity representative)
- 2nd Level Appeal (review by Internal Resolution Committee)
- 3rd Level Appeal (review by three sharing members in good standing)
- Final Appeal (review by medical expense auditor and other personnel)
- Mediation
- Arbitration

(*See* Decl. of K. Kromodimedjo for a full explanation of the specific requirements for each step in this dispute resolution process.)[3]  None of the Plaintiffs allege that they followed each of these steps in the dispute resolution process.  In fact, they did not.  (*See* Decl. of K. Kromodimedjo ¶¶ 12, 19, 26, 34.)

## II.   **ARGUMENT**

### A.   **All Claims Should Be Dismissed for Failure to Comply with Dispute Resolution Procedures Requiring Mediation.**

Each of the Plaintiffs jumped the gun in bringing this lawsuit, as they failed to comply with mandatory pre-suit dispute resolution procedures, particularly the requirement to mediate their claims. Their Complaint fails to allege otherwise.  All of Plaintiffs' claims should therefore be dismissed without prejudice.

---

[3] The Unity Member Guides contained virtually identical dispute resolution procedures. (*See, e.g.,* Decl. of K. Kromodimedjo, ¶ 17.)

Colorado embraces the right of parties to contract.  *See Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049, 1053 (Colo. 1994).  "The right of parties to contract encompasses the correlative power to agree to a specific ADR procedure for resolving disputes." *City & Cty. of Denver v. Dist. Ct.*, 939 P.2d 1353, 1361 (Colo. 1997) (en banc).  What's more, Colorado courts must enforce alternative dispute resolution agreements "unless the court can say 'with positive assurance' that the [ADR clause] is not susceptible of any interpretation that encompasses the subject matter of the dispute." *Id.* at 1363-64 (citations omitted).  *Accord, Laredo Landing Owners Ass'n v. Sequoia Ins. Co.*, No. 14-cv-01454-RM-KMT, 2015 WL 3619205, at *2 (D. Colo. June 10, 2015); *Digital Landscape Inc. v. Media Kings LLC*, 440 P.3d 1200, 1205 (Colo. App. 2018), *cert. denied*, 2109 WL 2178082 (Colo. 2019)..[4]

Here, Plaintiffs cannot reasonably allege that the mediation procedures set forth in the Member Guides have no possibility to resolve their claims.  Certainly their assertion that they were improperly denied payment for claims is grist for the dispute resolution mill: there is a multi-step process, starting with mediation, designed to resolve these types of claims.  The alternative claims can also be resolved through a consensual arrangement forged in mediation. In any event, since courts must "resolve all doubts about the scope of the ADR clause in favor of the ADR

---

[4] Courts throughout the country have followed this rule and enforced similar pre-suit dispute resolution procedures requiring mediation.  *See, e.g., World of Beer Franchising, Inc. v. MWB Dev. I, LLC*, 711 F. App'x 561, 570 (11th Cir. 2017) (affirming denial of preliminary injunction where movant failed to first submit claims to mediation); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 336 (7th Cir. 1987) (dealer's failure to follow contractual obligation to mediate before filing suit justified dismissal of his case); *Primov v. Serco, Inc.*, 817 S.E.2d 811, 817 (Va. 2018) (dismissing a case where plaintiff failed to comply with provision in a contract requiring mediation to occur before either party could proceed to court); *MB Am., Inc. v. Alaska Pac. Leasing*, 367 P.3d 1286, 1288-91 (Nev. 2016) (prelitigation mediation provision in the parties' contract constituted an enforceable condition precedent to litigation and justified dismissal of the complaint); *Tombs v. Nw. Airlines, Inc.*, 516 P.2d 1028, 1031 (Wash. 1973) ("[w]here the agreement provides for a method of resolving disputes … <u>that method must be pursued</u> before either party can resort to courts for relief") (emphasis added).

mechanism," *City & Cty. of Denver*, 939 P.2d at 1364, Plaintiffs' claims should be dismissed without prejudice because they failed to abide by the mediation requirements in their agreement.

**B.** **Alternatively, Plaintiffs Must Submit All Of Their Claims To Binding Arbitration.**

This Court is not an appropriate forum for another reason: Plaintiffs' agreements with Unity and Trinity contain binding arbitration provisions. (Decl. of K. Kromodimedjo ¶¶ 10, 17, 24, 32.) So, if the Court does not dismiss due to Plaintiffs' failure to mediate, the Court should at least compel Plaintiffs to submit all their claims to arbitration. The arbitrator can then decide whether the Plaintiffs' claims can proceed in arbitration before a mediation occurs. *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 35 (2014) (arbitrators usually decide whether pre-arbitration procedural requirements have been followed).

### 1.     Background And Structure Of The FAA.

Some background on arbitration enforcement is in order. For centuries, there was a widespread judicial (and legislative) antipathy to arbitration agreements. *Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). When Congress passed the Federal Arbitration Act ("FAA") in 1925, "it was 'motivated, first and foremost, by a desire' to change this anti-arbitration rule," *Allied-Bruce*, 513 U.S. 265, 270-71 (1995) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. at 220), and "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Byrd*, 470 U.S. at 219-20. Congress therefore enacted the FAA in order to place arbitration agreements "'upon the same footing as other contracts, where [they] belong[].'" *Id*. at 219 (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924)).

The FAA accomplishes these purposes by establishing that a written arbitration provision contained in a "contract evidencing a transaction involving commerce … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract." 9 U.S.C. § 2.  The Act mandates that "the court <u>shall</u> make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement," upon application of one of the parties, if there has been a "failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration."  9 U.S.C. § 4 (emphasis added).  The Act also provides that a court "<u>shall</u>" stay its proceedings if it is satisfied that an issue before it is arbitrable under the parties' agreement "until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3 (emphasis added).  Thus, by its terms, "the Act leaves no place for the exercise of discretion by a [trial] court, but instead mandates that [trial] courts <u>shall</u> direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd*, 470 U.S. at 218 (emphasis in original) (citing 9 U.S.C. §§ 3, 4).  To abide by this Congressional mandate, courts must "rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

The FAA accomplishes much more than merely creating a mechanism to enforce an arbitration agreement.  It establishes "a liberal federal policy favoring arbitration agreements" as a preferred method of dispute resolution.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  This federal policy favoring arbitration is so strong that it preempts any state law "to the extent that [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989).

There are some limits to enforcement of an arbitration agreement.  Section 2 of the FAA states that such an agreement is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  But this "saving clause" does not allow for "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement

to arbitrate is at issue. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  A state law or rule forbidding or limiting arbitration can find no help from the "saving clause" of section 2 of the FAA if it "prohibits outright the arbitration of a particular type of claim." *Id.* at 341.  Nor does a state law or rule find refuge in the "saving clause" if it would "interfere[ ] with fundamental attributes of arbitration."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019) (citing *Concepcion*, 563 U.S. at 344); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 131 S. Ct. 1421, 1426-28 (2017) (just as state rules outright prohibiting arbitration agreements are barred by the FAA, so too are rules that "covertly accomplish the same objective" by subjecting arbitration agreements to standards "tailor-made" to single such agreements out "for disfavored treatment").

### 2.    Prerequisites To Enforcement Under The FAA.

Under the FAA, an arbitration agreement must be enforced where: (1) the parties entered a written agreement to arbitrate claims, (2) the transaction has a nexus to interstate commerce, and (3) the arbitration clause encompasses the claims.  9 U.S.C. § 2.  Once again, each of these inquiries "must be undertaken against the background of a 'liberal federal policy favoring arbitration agreements.'"  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24; *see also Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532-33 (2012) (the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution") (citations omitted).  Given the strong federal policy favoring arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

### a.    The Agreement to Arbitrate Is Valid and in Writing.

State law controls the question of whether a valid agreement to arbitrate has been formed. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  So, we begin with Colorado's general views on arbitration agreements.  Colorado has historically favored arbitration:

> The people of Colorado enshrined pro-arbitration principles in the original 1876 Colorado Constitution, many years before arbitration gained widespread acceptance at the federal level.  The Colorado Constitution requires the Colorado legislature "to pass such laws as may be necessary and proper to decide differences by arbitrators, to be appointed by mutual agreement of the parties to the controversy who may choose that mode of adjustment." Colo. Const. Art. XVIII, § 3.  Consistent with such requirement, the Colorado legislature enacted various arbitration statutes ultimately culminating in the Colorado Uniform Arbitration Act, Colo. Rev. Stat. § 13-22-201 *et seq.* (the "CUAA").  Such law is extremely similar to the FAA.  The CUAA is "a uniform statutory framework for arbitration in order to encourage the settlement of disputes." *Lane v. Urgitus*, 145 P.3d 672, 678 (Colo. 2006).  *See also Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 493 (Colo. 1998) ("arbitration is a favored method of dispute resolution") … "[A]ll doubts as to whether a dispute is arbitrable are to be resolved in favor of arbitration." *Lane*, 145 P.3d at 680.

*In re Touchstone Home Health LLC*, 572 B.R. 255, 269 n.9 (Bankr. D. Colo. 2017) (citations omitted).

Under Colorado law, an agreement in writing to submit an existing controversy to arbitration is valid and enforceable.  *See Vallagio at Inverness Residential Condo. Ass'n, Inc. v. Metro. Homes, Inc.*, 412 P.3d 709, 713 (Colo. App. 2015), *aff'd*, 395 P.3d 788 (Colo. 2017).

The Unity Member Guide contains a valid, written agreement to arbitrate "any dispute" that Plaintiffs may have with Unity or its associates.  (Decl. of K. Kromodimedjo ¶ 17.)  When they joined the Unity HCSM, Plaintiffs Smith, Larson, and the Beards accepted the terms of the Guide by affirming that any medical expenses they submitted to Unity were subject to the Unity sharing guidelines – the Unity Member Guide.  (*See* Decl. of K. Kromodimedjo Ex. 2, pp. 18-19; Ex. 6, pp. 18-19; Ex. 11, pp. 18-19.)  They further manifested their assent to the terms governing membership in the Unity HCSM by making monthly membership contributions after they joined. Likewise, the Trinity Member Guide contains a valid, binding agreement to arbitrate "any dispute" between Plaintiffs and Trinity or its associates.  (Decl. of K. Kromodimedjo ¶ 24, Ex. 8, pp. 34-35; Doc. 18-21, pp. 30-31 (Beards' Trinity Member Guide), filed by Plaintiffs on 4/27/20 in *Larson, et al. v. The Aliera Companies Inc., et al.*, 1:20-cv-00102-DDD-KMT, in the United States

District Court for the District of Colorado.[5])  When they joined the Trinity HCSM, Plaintiffs Lund and the Beards accepted the terms of the Guide by affirming that medical any expenses they submitted to Trinity were subject to the Trinity Sharing guidelines contained in the Trinity Member Guide.  (*See* Decl. of K. Kromodimedjo Ex. 8, pp. 23-28.)  The welcome emails provided to Smith, Larson, Lund and the Beards provided live links to their Member Guides containing their arbitration provisions.  (Decl. of K. Kromodimedjo ¶¶ 6, 13, 20, 27.) Plaintiffs further manifested their assent to the terms governing membership in the Trinity HCSM by making monthly membership contributions after joining. (*See* Decl. of K. Kromodimedjo ¶¶ 8, 15, 22, 28.)

In Colorado, a "contract is formed when one party makes an offer and the other accepts it, and the agreement is supported by consideration."  *Sumerel v. Goodyear Tire & Rubber Co*., 232 P.3d 128, 133 (Colo. App. 2009).  Where, as here, "Defendant has presented evidence that there was reasonable notice of the arbitration agreement and that Plaintiff assented to that agreement," the burden shifts to the party opposing arbitration to raise a genuine dispute of material fact regarding formation of the agreement to arbitrate.  *Petrie v. GoSmith, Inc*., 360 F. Supp. 3d 1159, 1162 (D. Colo. 2019) (compelling arbitration).  "All doubts as to whether a dispute is arbitrable are to be resolved in favor of arbitration." *Lane v. Urgitus*, 145 P.3d 672, 680 (Colo. 2006) (en banc). Clearly, all Plaintiffs received an offer to enroll in an HCSM governed by their respective

---

[5] The Court may take judicial notice of pleadings filed in this district court in *Larson v. The Aliera Companies Inc., et al.,* 1:20-cv-00102-DDD-KMT.  *See* Fed. R. Evid. 201 ("Federal Rule of Evidence 201 permits a court to 'judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b)(2)); *see also St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("A court may [ ] take judicial notice [ ] of its own records and files, and facts which are part of its public records," among other appropriate matters).

Member Guides, which included agreements to arbitrate, and manifested their assent by making monthly contributions. The parties formed written agreements to arbitrate under Colorado law.

### b. Interstate Commerce Is Present.

Section 2 of the FAA requires that the parties' transaction involved "commerce." 9 U.S.C. § 2. The term "involving commerce" has been interpreted as the functional equivalent of the more familiar term "affecting commerce" and "encompasses a wider range of transactions than those actually 'in commerce' – that is, 'within the flow of interstate commerce.'" *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citing *Allied-Bruce Terminix*, 513 U.S. at 273). This means that "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal court.'" *Citizens Bank*, 539 U.S. at 56-57 (citing *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)). The FAA extends to the full reach of the Commerce Clause. *See Allied-Bruce Terminix,* 513 U.S. at 270; *Perry v. Thomas*, 482 U.S. 483, 490 (1987).

The "commerce" requirement is easily met here. Plaintiffs all live in Colorado. (Doc. 6 at ¶¶ 1-4.) They sent monthly sharing payments from their home states to Aliera in Georgia for the benefit of the Unity and Trinity HCSMs. (Decl. of K. Kromodimedjo ¶ 35.) Their sharing contributions were part of a larger group of contributions made by other members in the Unity and Trinity HCSMs. (*Id.* ¶ 36.) On behalf of Unity and Trinity, Aliera received sharing contributions from members across the country, interacted with members and their local medical care providers, and processed payments to providers throughout the country from the members' contributions. (*Id.*)

### c.    The Arbitration Provisions Encompass Plaintiffs' Claims.

The arbitration provisions here unquestionably encompass each of the Plaintiffs' claims. When determining the scope of an arbitration provision, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Sci.,* 489 U.S. at 476.  The presumption of arbitrability, created by the mere existence of an arbitration clause, may be rebutted only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted).  Where, as here, the arbitration provision is a "broad" one (covering "all disputes"), the presumption in favor of arbitrability applies with even greater force. *Id.*

The present dispute falls within the scope of the Unity and Trinity Member Guides' broad arbitration provisions. Both of the Member Guides refer to arbitration of "any dispute." (*See* Decl. of K. Kromodimedjo ¶¶ 24, 32.)  The "disputes" contemplated by the Unity Member Guides specifically include, by example, any "determination" made by Unity, Trinity, or their "associates" with which Plaintiffs disagree.  (*Id.* ¶ 32.)  Plaintiffs allege that Aliera, Unity and Trinity improperly refused to pay Plaintiffs' medical expenses.  (*See generally* Doc. 6.)  A determination as to covered medical expenses is exactly the sort of dispute contemplated in the alternative dispute resolution procedures of the Member Guides.

Each of the claims asserted by Plaintiffs, moreover, are the types that courts have already determined are arbitrable:

- <u>Illegal Contracts</u>:  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448-49 (2006).

- <u>Violations of Colorado Consumer Protection Act</u>:  *See Vallagio.*, 412 P.3d at 720; *Triple Crown at Observatory Vill. Ass'n, Inc. v. Vill. Homes of Colo., Inc.*, 328 P.3d 275, 283 (Colo. App. 2013); *Gergel v. High View Homes, LLC*, 996 P.2d 233, 237 (Colo. App. 2000).

- <u>Breach of Fiduciary Duty</u>:  *See Dumas v. Warner Literary Grp., LLC,* No. 16-CV-00518-RM-NYW, 2016 WL 9344244, at *2 (D. Colo. Aug. 8, 2016); *LS Dev. Enters., Inc. v. Forest City Commercial Grp., Inc.*, No. 05-CV-02418-RPM, 2006 WL 771218, at *1 (D. Colo. Mar. 24, 2006).

### d.    Aliera May Invoke the Arbitration Provision.

Although the agreements requiring mediation expressly identify the members and the HCSM's, they cover all claims against Aliera as well.  Both Unity's and Trinity's member guides provide that all disputes that a member may have with an **"associate"** of the HCSM must also be submitted to arbitration.  (*See* K. Kromodimedjo ¶¶ 10, 17, 24, 32.)

The plain meaning of the term "associate" encompasses Aliera under the circumstances of this case.  One commonly-used dictionary defines the noun "associate" as "one associated with another," and lists "business associates" as an example. *See Associate,* Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/associate. *See also* Webster's Third New International Dictionary 132 (1992) ("associate" means a person "clearly connected, joined, or united with one another").

Plaintiffs obviously perceive Aliera as an "associate" of both Unity and Trinity.  They repeatedly allege associations between Aliera and Unity in the complaint, including: that "Aliera entered into a contract with Anabaptist and/or Unity" under which "Aliera would offer health products to the public" and "in return, Aliera's customers would join Unity ... Unity delegated all authority and responsibility to Aliera to create, design, market, and administer products sold under the Unity name. All those who purchased the Aliera/Unity products became members of both Aliera and Unity."  (Doc. 6 ¶ 39.)  The Complaint likewise alleges that "Aliera signed an agreement

with Trinity in which Trinity delegated to Aliera the authority to create, market, sell, and administer the purported HCSM plans under Trinity's name." (*Id.* ¶ 51). Plaintiffs in essence claim that Aliera worked hand-in-hand, first with Unity and then with Trinity, to accomplish what Plaintiffs allege is a wide-ranging cause of illegal conduct. (*See* Doc. 6 at ¶¶ 8, 9.)  Thus, there can be no legitimate dispute that Aliera, under Plaintiffs' own allegations, qualifies as an "associate" of both Unity and Trinity.  Any other interpretation would render the term "associate" meaningless in this situation, a result Colorado law forbids. *See Frazier v. W. Union Co.*, 377 F. Supp. 3d 1248, 1262 (D. Colo. 2019).[6]

Even if Plaintiffs' agreements to arbitrate their "disputes" with "associates" of Unity and Trinity do not expressly incorporate Aliera, there are other reasons why Aliera can invoke the arbitration provisions in the Unity and Trinity Member Guides.  These nontextual grounds include third-party beneficiary and equitable estoppel.

Aliera may invoke the dispute resolution provision as a third-party beneficiary.  Under Colorado law, a third-party beneficiary may enforce a dispute resolution provision if both contracting parties intend that a third-party beneficiary relationship exists. *See Lane,* 145 P.3d at 683 (Eid, J., concurring) ("This is an unremarkable application of the black-letter rule that a third-party beneficiary may enforce the terms of a contract."); *Parker v. Ctr. for Creative Leadership*, 15 P.3d 297, 298 (Colo. App. 2000) (compelling third-party beneficiary to arbitration).  A third-party beneficiary contract exists if performance under the contract would directly benefit the third party. *See E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985) (en banc).  Here, Plaintiffs allege that Aliera "collected over $300,000,000 in member payments

---

[6] The Unity and Trinity member guides refer to Aliera extensively throughout, providing contact information for Aliera and detailing the services it would provide to members. (*See* Decl. of K. Kromodimedjo Exs. 2, 6, 8, 11.)

for the Aliera/Unity plans," received "substantial" administrative fees by providing services to Trinity and that "Aliera took millions of dollars in administrative fees." (Doc. 6 at ¶¶ 40, 51, 78.) Putting aside the inaccuracy of these figures, there is no dispute that Plaintiffs allege the Member Guides benefit Aliera as the sole administrator. (*Id.*) "It is hard to imagine a more direct benefit under a contract than a provision providing for the payment of money." *Church v. Expedia Inc.,* No. C18-1812JLR, 2019 WL 2422577, at *4 (W.D. Wash. June 10, 2019).

Aliera may also invoke the arbitration provisions under a theory of equitable estoppel, which in Colorado requires proof of the following four elements:

> [T]he party against whom the estoppel is asserted must know the [relevant] facts; that party must also intend that its conduct be acted upon or must lead the other party to believe that its conduct is so intended; the party claiming estoppel must be ignorant of the true facts; and the party asserting the estoppel must detrimentally rely on the other party's conduct,

*Santich v. VCG Holding Corp.,* 443 P.3d 62, 65 (Colo. 2019) (alterations in original) (citation omitted). In this context, all of the Plaintiffs received Member Guides and related materials indicating that Aliera qualified as an associate of Unity and Trinity and thus they knew that Aliera was a party to the arbitration provision. The Plaintiffs clearly intended that Aliera perform its function under the Unity and Trinity member guides as an administrator. Aliera had no reason to believe the Plaintiffs intended to disavow any portion of any arbitration provision. (*See* K. Kromodimedjo ¶¶ 6, 13, 20, 27.) Aliera thus relied on Plaintiffs' conduct to its detriment in that Aliera now faces potential loss of arbitration rights by Plaintiffs' failure to inform Aliera that Plaintiffs had no intention of honoring the arbitration provision. Thus, all elements of equitable estoppel have been met, and Aliera may enforce the arbitration provision.

C.   **All Possible Challenges To The Enforceability Of The Arbitration Provision Must Also Be Resolved By The Arbitrator.**

Not only are each of Plaintiffs' substantive claims subject to arbitration, but any potential defenses Plaintiffs may have to the arbitrability of their claims must also be submitted to arbitral resolution.  Binding precedent forecloses any contrary arguments.

First, Plaintiffs certainly cannot challenge the validity of the arbitration provisions by asserting that the Unity and Trinity Member Guides containing them are unenforceable because those arrangements are illegal contracts.  The Supreme Court has directly foreclosed such an approach in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006).  In that case, the borrowers sought to avoid arbitration by asserting that the loan agreements containing them were illegal contracts because they violated Florida's usury laws.  The Supreme Court flatly rejected this argument, holding that where a party advances a challenge to "the validity of the contract as a whole, and not specifically to the arbitration clause," the challenge "must go to the arbitrator." *Id.* at 449.  *Accord Preston v. Ferrer*, 552 U.S. 346, 353-54 (2008) (holding that an arbitrator had to decide a contractual dispute even though one of the parties alleged that the contract containing the arbitration provision was illegal under California law); *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1211 (10th Cir. 2016) (arbitrator must decide challenge to entire agreement as illusory).

Second, the parties in this case have delegated all issues as to the validity or enforceability of the arbitration agreement to the arbitrator.  They accomplished this in the Unity Member Guide by incorporating the rules of the Institute for Christian Conciliation, and in the Trinity Member Guide by incorporating the rules of the American Arbitration Association.  (Decl. of K. Kromodimedjo ¶¶ 10, 17, 24, 32.)  Under each set of arbitration rules (ICC Rule 34(B); AAA Commercial Rule 7(a); AAA Consumer Rule 14(a)), the arbitrator is given the power to rule on

his or her own jurisdiction, including any challenges to the existence, scope, or validity of the arbitration agreement.[7]   The FAA's mandate that courts must rigorously enforce arbitration agreements according to their terms applies with equal force to terms specifying "with whom the parties choose to arbitrate their disputes and the *rules* under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citation omitted).

Both the Supreme Court and the Tenth Circuit have concluded that these types of clauses delegating all gateway issues to the arbitrator, whether expressly stated in the agreement or incorporated by reference in arbitral body rules, are enforceable because they provide clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 72-73 (2010); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1282-84 (10th Cir. 2017).   These "delegation clauses" are "simply an additional, antecedent agreement the party seeking to enforce arbitration asks the federal court to enforce, and the FAA operates on this additional agreement just like it does on any other." *Rent-A-Center*, 561 U.S. at 70.   So, unless a plaintiff can successfully challenge the delegation clause itself, separate and apart from the challenge to the rest of the arbitration provision, any challenge to the validity of the arbitration agreement as a whole must be resolved in arbitration. *Id.* at 72.   Most courts, moreover, have concluded that these "rule-incorporation" delegations of arbitrability also assign to the arbitrator the question of whether a non-signatory can invoke an arbitration provision in a suit brought by a signatory. *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842 (6th Cir. 2020) (collecting cases).   Thus, any challenge that Plaintiffs could possibly raise to defeat or avoid the arbitration provisions must be decided in the first instance by the arbitrator, not the Court.

---

[7]   *See   adr.org/commercial;   adr.org/consumer;   https://peacemaker.training/ guidelinesforchristianconciliation/

Finally, Plaintiffs cannot successfully challenge the arbitration provisions by contending that Unity or Trinity's plans were actually "insurance" because that is a merits issue to be decided by the arbitrator. The Supreme Court recently made clear that even if the Court believes that a claim is wholly groundless, "a court may not 'rule on the potential merits of the underlying' claim that is assigned by contract to an arbitrator." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *AT&T Techs.*, 475 U.S. at 649-50 (a court has "no business weighing the merits of the grievance" – that is for the arbitrator))[8]; *see also S. Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 146 (3d Cir. 2016) (an arbitrator, not the court, had to decide the ultimate merits issue of whether the transactions at issue constituted insurance, which was the key linchpin for application of Nebraska's arbitration ban in insurance contracts); *Milan Express Co. v. Applied Underwriters Capture Risk Assurance Co.*, 590 F.App'x 482, 486 (6th Cir. 2014) (same); *Nandorf v. Applied Underwriters Captive Risk Assurance Co.*, 410 F. Supp. 3d 882, 890 (N.D. Ill. 2019) (same); *appeal filed*, No. 19-3090 (7th Cir. Oct. 23. 2019).  A court, moreover, should also not prejudge how an arbitrator might resolve uncertainties around key merits issues in order to wrest that decision from the arbitrator. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406-07 (2003).

### D.    This Court Should Stay This Case Until The Parties Have Completed The Arbitration Process.

The FAA states that a court **shall** stay judicial proceedings upon determining the matter is subject to arbitration.  9 U.S.C. § 3.  Numerous decisions affirm this general principle.  *See e.g., Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000); *Elliott v. Essex Motors, LLC*, No. 12-cv-

---

[8] The Court in *Henry Schein* expanded this principle (no consideration of the merits) to include "arbitrability questions" that the parties have "delegated to an arbitrator." *Henry Schein*, 139 S. Ct. at 530.

01078-REB-KLM, 2012 WL 4049844, at *1 (D. Colo. Sept. 13, 2012); *Goodwin v. H.M. Brown & Assocs., Inc.*, No. 10-CV-01205-PAB-MEH, 2011 WL 820025, at *5 (D. Colo. Mar. 2, 2011).

### III.   <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should dismiss this case without prejudice on the grounds that none of the Plaintiffs complied with the ADR requirements in their Agreements with Unity or Trinity that obligated them to first submit their claims to mediation.  Alternatively, this Court should grant Aliera's motion to compel arbitration of Plaintiffs' claims and to stay all further proceedings until the arbitration process is concluded.

Respectfully submitted on August 3, 2020.

*/s/ Sarah R. Craig*
Sarah R. Craig, Esq.
BURR & FORMAN, LLP
One Tampa City Center
201 North Franklin Street, Ste. 3200
Tampa, Florida 33602
Telephone:    (813) 367-5766
Facsimile:     (813) 221-7335
scraig@burr.com; dmorales@burr.com;
lgmiller@burr.com

**OF COUNSEL**
Robert H. Rutherford
Elizabeth B. Shirley
BURR & FORMAN, LLP
420 North 20th Street
The Shipt Tower, Ste. 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
rrutherford@burr.com
bshirley@burr.com

*Attorneys for Defendant, The Aliera Companies Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2020, I electronically filed the foregoing Motion to Dismiss or Compel Arbitration with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record:


*/s/ Sarah R. Craig*
Sarah R. Craig