IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02130-RBJ

REBECCA SMITH;
ELLEN LARSON;
JUSTINE LUND; and
JAIME and JARED BEARD, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE ALIERA COMPANIES, INC., formerly known as ALIERA HEALTHCARE, INC.,
a Delaware corporation;
TRINITY HEALTHSHARE, INC., a Delaware corporation; and
ONESHARE HEALTH, LLC, formerly known as UNITY HEALTHSHARE, LLC and as
KINGDOM HEALTHSHARE MINISTRIES, LLC, a Virginia limited liability corporation.

      Defendants.

---

## AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

---

## I.  PARTIES

1.  Plaintiff REBECCA SMITH is a citizen of Colorado who resides in Boulder. Ms. Smith was enrolled in a health care plan from some or all Defendants from May 1, 2018 to June 1, 2019.

2.  Plaintiff ELLEN LARSON is a citizen of Colorado who resides in Colorado Springs. Ms. Larson was enrolled in a health care plan from some or all Defendants from July through December 2018.

3.  Plaintiff JUSTINE LUND is a citizen of the state of Colorado who resides in Berthoud. Ms. Lund was enrolled in a health care plan from Defendants Aliera and Trinity from February through April 2019.

4.      Plaintiffs JAIME and JARED BEARD, husband and wife, are citizens of Colorado who reside in Parker. Mr. and Ms. Beard were enrolled in a health care plan from some or all of Defendants from August 15, 2018 through October 14, 2019.

5.      Defendant THE ALIERA COMPANIES, INC. is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit entity without any express religious affiliation. It changed its name from ALIERA HEALTHCARE, INC. Collectively, defendants The Aliera Companies, Inc. and Aliera Healthcare, Inc. are referred to as "Aliera."

6.      Defendant TRINITY HEALTHSHARE, INC. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity. Trinity was incorporated on or about June 27, 2018.

7.      Defendant ONESHARE HEALTH, LLC is a Virginia limited liability corporation. On information and belief, it is headquartered in Irving, Texas, and was previously headquartered in Atlanta, Georgia. OneShare Health, LLC was formerly known as KINGDOM HEALTHSHARE MINISTRIES, LLC, and before that as UNITY HEALTHSARE, LLC. Because the majority of the actions described in this Complaint occurred when OneShare Health, LLC was known as Unity Healthshare, LLC, it will be referred to as "Unity" in this Complaint. Unity was "organized" by Anabaptist Healthshare.

8.      Aliera created, marketed, sold, and administered insurance plans for Unity and was solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force, and administration of claims on behalf of Unity.

9.      Aliera markets, sells, and administers insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force, and administration of claims on behalf of Trinity.

10.     Neither Aliera, Trinity, nor Unity holds a certificate of authority from the Colorado Division of Insurance as required by C.R.S. § 10-3-105, and none of them is authorized or licensed as an insurer to provide any type of insurance plan in Colorado.

## II.   JURISDICTION AND VENUE

11.     Defendants Trinity, Unity, and Aliera all sold health plans to Colorado residents in Colorado, and this Court has jurisdiction over them. In addition, Defendant Aliera is licensed as an insurance producer (agent) in Colorado, license number 544844.

12.     Venue is properly before this Court pursuant to C.R.C.P. 98 (c) and C.R.S. § 6-1-103 because Plaintiff Smith resides in Boulder County and Defendants issued and delivered her health plan there, and because Defendants committed deceptive trade practices in this County.

## III.   NATURE OF THE CASE

13.     Defendants sold inherently unfair and deceptive health care plans to Colorado residents, and failed to provide them with the coverage the purchasers were led to believe they would receive. Defendants claimed the health care plans were not "insurance" to avoid oversight by the state insurance commissioner. At the same time, Defendants created the health care plans to look and feel like health insurance that would provide meaningful coverage for the purchasers' health care needs.

14.     When Congress passed the Patient Protection and Affordable Care Act ("ACA") in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("HSCMs"). In order to qualify as an HSCM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs;" (3) its members must "retain membership even after they develop a medical condition;"

(4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999;" and (5) it must conduct an annual audit. 26 U.S.C. § 5000A(d)(2)(B)(ii).

15.    Aliera, in an attempt to exploit this exception, convinced Unity's parent to create defendant Unity as a sham HCSM. When Aliera's relationship with Unity's parent soured, it created Defendant Trinity as a sham HCSM to replace Unity.

16.    Although Aliera and Unity represented Unity as a "recognized" HCSM, Unity did not meet the requirements of an HCSM under 26 U.S.C. § 5000A(d)(2)(B)(ii) because, for example, it was not in existence until 2016 and it had no members before then. Unity and Aliera falsely claimed that Unity had been "recognized" as an HCSM based on recognition of Unity's organizer, Anabaptist Healthshare ("Anabaptist") as an HCSM, even though Anabaptist's recognition was based on service of a different religious community, and Anabaptist was not Unity's "predecessor."

17.    Similarly, although Aliera and Trinity represented that Trinity was a "recognized" HCSM, Trinity did not meet the requirements of an HCSM under 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence until 2018, it had no members before then, and because it did not require its members to adhere to its stated ethical or religious beliefs. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created.

18.    Aliera was authorized by Unity and then by Trinity to sell illegal health insurance plans to Colorado residents, while representing those plans as from recognized HCSMs. Aliera sold, at the instance of Unity and Trinity, illegal health insurance plans to hundreds, if not thousands, of Colorado residents. These plans did not comply with the minimum basic requirements for authorized health care plans under state or federal law, and have resulted in Colorado residents (1) paying for an illegal contract, and (2) being denied coverage for medical

care required by law to be provided. Defendants, and their principals, however, have realized exorbitant profits.

19.    These plans qualify as health insurance under Colorado law, C.R.S. § 10-1-102(6)(a) and are unauthorized under C.R.S. § 10-3-105. The unauthorized insurance plans did not meet the minimum benefits, coverage, and other requirements for health insurance in Colorado. They are illegal contracts.

20.    Specifically, the plans Aliera created, marketed, sold, and administered on behalf of both Unity and Trinity provided certain payment benefits in the event of specified health-related contingencies in exchange for a monthly payment. The amount of benefits was tied to the amount of the monthly premium payment and the cost incurred by the customer for health-related medical treatments. Under Colorado law, the arrangement fits squarely within the definition of "insurance" and may not be marketed, sold or administered without meeting minimum requirements and obtaining authorization from the Colorado Department of Insurance.

21.    Defendants' representations that the insurance plans were HCSM plans and would provide meaningful coverage for healthcare needs were misleading. At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law as represented. They created and marketed the plans to look and feel like insurance plans, and sold and administered the plans with the intention of securing their own profits by arbitrarily delaying and denying claims that their members would reasonably expect to be paid, leaving members with no effective recourse.

22.    Even if the plans qualified as coming from a legitimate HCSM, Colorado does not recognize any exception from insurance regulations for HCSMs.

23.    Plaintiffs, on behalf of the classes they seek to represent, filed this lawsuit to obtain declaratory and injunctive relief to prevent Defendants from continuing to arbitrarily and in bad faith delay payment of and deny claims that should be covered under legitimate health insurance

plans. On behalf of the proposed class and on their own behalf, Plaintiffs also seeks damages related to uncovered health care expenses, premiums paid and other losses due to Defendants' creation, marketing, sale, and administration of unauthorized and illegal health insurance plans. They also seek restitution and imposition of a constructive trust. Defendants breached their fiduciary duties to class members and have been unjustly enriched. They have refused to pay legitimate claims and have unreasonably profited from class members whose payments were made on the reasonable belief, based on Defendants' representations, that their medical expenses would be covered.

## IV.  CLASS ALLEGATIONS

24.    ***Definition of Class:***  Pursuant to C.R.C.P. 23, Plaintiffs bring this action on behalf of themselves and all persons similarly situated. The proposed Class is defined as follows:

> All Colorado residents who, at any time within the relevant statute of limitations, purchased a plan from Aliera and either Unity Healthshare LLC or Trinity Healthshare Inc. that purported to be a "health care sharing ministry."

25.    ***Size of the Class:***  The Plaintiffs' proposed class is so numerous that joinder of all members is impracticable. Hundreds, if not thousands, of individuals in Colorado are covered by Defendants' plans.

26.    ***Common Questions of Fact and Law:***  There are questions of law and fact that are common to all class members including:  (1) whether the healthcare products that the Defendants created, marketed, sold, and administered to class members met the legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether plans sold were "insurance" under Colorado insurance law; (3) whether Colorado insurance law and regulations forbid the creation, marketing, sale, and administration of health care products in the "business of insurance" without authorization or other legal exception; (4) whether Defendants failed to obtain proper authorization for the creation, marketing, sale, and administration of an insurance product in Colorado; (5) whether class members are entitled to (a) rescission of the plan(s) and refunds of all premiums

paid and/or (b) reformation of the plans to comply with the minimum insurance coverage requirements of Colorado and federal law, and re-processing of all claims for expenses and costs incurred that would have been covered had the plan(s) properly complied with those laws; (6) whether Defendants owed a fiduciary duty to their members, and whether they breached that fiduciary duty; (7) whether Defendants have been unjustly enriched by failing to pay claims and unjustly received profits that should be disgorged; and (8) whether a constructive trust should be imposed.

27.     ***Class Representative:***  The claims of the named Plaintiffs are typical of the claims of the proposed class as a whole resulting from Defendants' sale of unauthorized and illegal insurance plans. The named Plaintiffs will fairly represent and adequately protect the interests of the class members because they have been subjected to the same practices as other class members and suffered similar injuries. The named Plaintiffs do not have interests antagonistic to those of other class members as to the issues in this lawsuit.

28.     ***Separate Suits Would Create Risk of Varying Conduct Requirements***. The prosecution of separate actions by class members against some or all of the Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under C.R.C.P. 23(b)(1).

29.     ***Defendants Have Acted on Grounds Generally Applicable to the Class.*** Defendants Aliera, Unity, and Trinity have uniformly created, marketed, sold and administered unauthorized health insurance plans in Colorado. They have misrepresented the plans as HCSM plans under federal law. Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the whole class. Certification is therefore proper under C.R.C.P. 23(b)(2).

30.    ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues.*** The claims of the individual class members are more efficiently adjudicated on a class-wide basis. Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Aliera and/or Unity and/or Trinity for the relief requested in this action. Issues as to Aliera's and/or Unity's and/or Trinity's conduct in applying standard marketing, sales and administration practices towards all members of the class predominate over questions, if any, unique to members of the class. All members of the class are or were at the time of coverage residents of Colorado, and the same state law applies to all claims that are subject to the same common proof. Certification is therefore additionally proper under C.R.C.P. 23(b)(3).

31.    ***Venue***. This action can be most efficiently prosecuted as a class action in the Boulder County where Defendants conducted business and committed deceptive trade practices, and where Plaintiff Smith resides.

32.    ***Class Counsel***. Named Plaintiffs have retained experienced and competent class counsel.

## V.    FACTUAL BACKGROUND

**A.    Aliera Sold Healthcare Plans through Unity, a Sham Healthcare Sharing Ministry, to Avoid ACA and State Insurance Regulations, but Its Relationship with Unity's Parent Ended in Discord**

33.    Defendant Aliera was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife Shelley Steele, and their son Chase Moses, in December 2015. Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury. As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-

CAP-JMF (N.D. Ga.), Moses was sentenced to over six years in prison, and ordered to pay $1.65 million in restitution.

34.    Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders ..." The formation documents of Aliera Healthcare, Inc. do not include any discussion of religious or ethical purposes or missions.

35.    Aliera began selling its healthcare products in late 2015. At the time it was formed, it only sold "direct primary care medical home (DPCMH)" plans. DPCMH plans generally cover limited services such as some doctors' visits and basic lab services. These plans provide no hospitalization or emergency room coverage and are not ACA compliant.

36.    Aliera realized it could greatly increase the sales of its healthcare products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSMs from the ACA's individual mandate. It realized also that if it claimed the healthcare products it sold were "not insurance," it could claim to be exempt from, and avoid regulation by, state insurance regulators.

37.    Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity with a few hundred members located in Virginia. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM in 2015.

38.    Upon his release from prison, and after forming Aliera, Timothy Moses convinced Anabaptist to permit Aliera to market its own DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a new wholly owned subsidiary, called Unity Healthshare, LLC ("Unity"), for that purpose. Under the proposal, Aliera

would market both its own plan and the Unity HCSM together as a healthcare product it claimed would be an HCSM exempt from the ACA's mandates and insurance regulation.

39.    Aliera entered into a contract with Anabaptist and/or Unity on or about February 1, 2017. Under that contract, Aliera would offer health products to the public that did not meet the insurance benefits and coverages required by the Affordable Care Act and that did not independently qualify for the HCSM exemption in 26 U.S.C. § 5000A. In return, Aliera's customers would join Unity, which claimed to be an HCSM, increasing members to Anabaptist through its subsidiary. Unity delegated all authority and responsibility to Aliera to create, design, market, and administer products sold under the Unity name. All those who purchased the Aliera/Unity products became members of both Aliera and Unity.

40.    Although Aliera marketed the plans to consumers throughout the country and in Colorado as HCSM plans through Unity, in reality, Unity was merely a shell with a purported HCSM designation, through which Aliera, a for-profit entity that was never an HCSM could push its own products, while designing, marketing, selling, administering, and controlling the Unity plans. All member payments were made directly to Aliera. Members enrolled in the plan through Aliera's website. Aliera created, maintained, and controlled the Unity website. Nationwide, Aliera collected over $300,000,000 in member payments for the Aliera/Unity plans.

41.    Unity was not and could not be an HCSM because it was created after December 31, 1999, and at the time of its creation, had no members. In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity, among other requirements, must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Unity did not have members who had shared medical expenses "continuously and without interruptions since at least December 31, 1999." It had no members when it was formed. Nor does it have a predecessor entity. Anabaptist, the entity through which it

claimed HCSM status, was its parent, not its predecessor. Unity was never "recognized" as an HCSM by CMS.

42.    In selling Unity-branded products, Aliera did not require members to attest to the Mennonite beliefs of its parent, or to any other common religious belief, but only required a pro forma acknowledgment to adhere to a generic spiritual and ethical belief.

43.    In 2018, after thousands of Aliera/Unity plans had been sold nationwide, and at least hundreds had been sold to Colorado residents, Anabaptist discovered that Mr. Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits. It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

**B.    Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements and State Insurance Regulations**

44.    With its relationship with Unity terminating, Aliera would have no affiliation with any entity claiming to be an HCSM. Aliera and its principals therefore created Trinity on June 27, 2018, as a purported nonprofit entity. William Rip Theede, III was the CEO of Trinity. Mr. Theede is a former Aliera employee. He is also a close family friend of the Moses family and officiated at Chase Moses' wedding. Trinity had two board members – Mr. Theede and Mr. Theede's brother.

45.    Trinity represented, in its Statement of Foreign Authority filed with the Colorado Secretary of State, that it commenced doing business in Colorado on August 13, 2018, three days after Unity terminated its relationship with Aliera. ***Appendix 1.***

46.    Trinity could not qualify as an HCSM because it was created after December 31, 1999, and at the time of its creation, had no members. In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity, among other requirements, must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C.

§ 5000A(d)(2)(B)(IV).  Trinity  has  not  had  members  who  have  shared  medical  expenses "continuously and without interruptions since at least December 31, 1999." It had no members when it was formed, and has no predecessor entity.

47.    In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members  in  accordance  with  those  beliefs…."  26 U.S.C.  § 5000A(d)(2)(B)(III).  Although Trinity's bylaws set forth a specific set of religious beliefs, it has never restricted its membership to those individuals who affirm the specific common beliefs. Members are only asked to affirm a generic "Statement of Beliefs" – the identical "Statement of Beliefs" that Aliera had created for use in conjunction with its Unity-branded products – that refers to no particular religion. *See Appendix 2*, p. 18; *Appendix 3*, p. 20; *Appendix 4*, p. 18. As stated in "frequently asked questions" on Defendants' website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." *Appendix 5*, p. 11. As a practical matter, the generic Statement of Beliefs allows sale of the health care products to the general public.

48.    While prospective agents must take a training assessment, the questions asked in the assessment do not address any religious or ethical motivation. Defendants' advertisements for prospective agents, and the training materials for agents do not mention a religious or ethical component for purchasers of these plans. In a video posted to YouTube dated November 1, 2018,[1] an  unidentified  Aliera  trainer  for  new  or  prospective  agents  discussed  the  Aliera  Healthcare Enrollment Process. According to the video, in order to enroll in Aliera, the consumer must positively respond to a number of questions. The first question asks if the consumer agrees with Trinity's "statement of faith:"

---

[1] https://www.youtube.com/watch?v=PiwoaXt8Z78 (last visited 6/19/20) starting at 12:23.

… It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits – things that, you know, cause us illness that are in our control.

As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

49.    Aliera and Trinity represent that Trinity is "recognized" as a qualified HCSM. *See Appendices 24, 29, 32.* It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated in 2016 before Trinity was created. *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs). Trinity has never appeared on any list of recognized HCSMs developed by HHS.

50.    Likewise, the Internal Revenue Service ("IRS") does not recognize and has never recognized any entities as HCSMs. Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns. The IRS has never recognized Trinity or Unity as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B). Defendants' representations to the contrary are false and misleading.

51.    On or about August 13, 2018, Aliera signed an agreement with Trinity in which Trinity delegated to Aliera the authority to create, market, sell, and administer the purported HCSM plans under Trinity's name. The contract allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control of the money, the administration of the plans, and the membership roster. Under the Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support. The Agreement provides that all member "contribution" payments are made directly to Aliera, which then allocates 30-40% (depending on the plan) of every payment to commissions, and that Aliera will be paid substantial additional administrative fees. Under the

Agreement, only a fraction of the amount of a member's contributions (as little as 15.5% of the plans class plaintiffs here purchased) was actually to be placed into a Trinity "Sharebox" account for payment of claims.

52.    On information and belief, Aliera began selling new Aliera/Trinity plans to Colorado residents in the fall of 2018.

**C.    Aliera Maintained Control of All Unity Member Accounts, and Attempted to Transfer Them to Trinity Accounts**

53.    Anabaptist terminated the relationship with Aliera on or about August 10, 2018. Aliera sued Anabaptist/Unity in Superior Court of Fulton County Georgia in late 2018. *See Aliera Healthcare v. Anabaptist Health Share et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) (the "Georgia Litigation"). Anabaptist counterclaimed, *inter alia,* that Aliera had failed to properly allocate and segregate the portion of the membership payments that was allocable to the Unity health care plans. Aliera claims that it is entitled at least 65% of each member's payment, but Unity contests that.

54.    Aliera sent an email to all Aliera/Unity members on or about November 15, 2018, notifying them that their plan would automatically change to a Trinity plan, and that ***"No Action Is Needed"*** by members for that automatic change. Aliera advised the members that there would be no changes to their plan except the name. *See **Appendix 20.*** Aliera sent members new member cards and new Member Guides with the Trinity name. The Member Guides with the Trinity name were virtually identical to the Member Guides they had sent under the Unity names. All telephone numbers for member services, claims, and pre-authorization remained the same.

55.    On Anabaptist's motion in the Georgia Litigation, the court issued a temporary restraining order on December 28, 2018, enjoining Aliera from transferring any Unity members to Trinity, and requiring that Aliera notify members that their plans would not automatically transfer. If a member had opted out of an Aliera-administered plan before that notice was sent, the member

received no correcting notice that the plan, or the administration of pending claims, remained with Unity.

56.     Even though Aliera had been enjoined from transitioning the Unity accounts to Trinity, Aliera sent Unity members Explanations of Benefits ("EOBs") with the Trinity logo for healthcare expenses incurred before the transition. ***Appendix 28.*** Trinity and Aliera now take the position that Unity is responsible for those healthcare obligations.

57.     On April 25, 2019, the court in the Georgia Litigation entered an interlocutory injunction, preventing Aliera from unilaterally transferring Unity members to Trinity members, but allowing both Aliera and Unity to solicit those "legacy" Unity members. The court appointed a receiver to oversee and monitor Aliera's administration of those assets, finding that Aliera's lack of transparency, misrepresentations regarding commingling of assets, and failure to make a full accounting of funds, necessitated the appointment. *See **Appendix 7**,* Order Entering Interlocutory Injunction and Appointing Receiver. The court also found that administrative fees paid to Aliera amounted to millions of dollars. *Id.* The receiver was charged with determining the total amount of funds in Aliera's control that corresponded with the Unity component of the Aliera/Unity plans.

58.     Aliera then solicited Unity members to join Trinity. For those members whose health plans were transitioned to a Trinity plan, there was no change – their payments continued to be paid directly to Aliera, and Member Guides were virtually unchanged. For those with unpaid claims at the time of the transition, Aliera and Trinity now claim that Trinity has no responsibility for their payment, and that they are the responsibility of Unity.

59.     The receiver appointed to oversee and monitor the assets found, in his initial reported dated November 22, 2019, that:

> **Aliera Commingled Funds** – Aliera used a single bank account in which they commingled funds related to its business venture with Unity and their non-Unity

related interests with other partners. All Unity and non-Unity member payments were deposited into a single bank account exclusively controlled by Aliera.

*Appendix 8*, p. 5.

60.    The court in the Georgia Litigation will ultimately decide which portion of the members' payments should be allocated to Unity and which portion should be allocated to Aliera. Regardless of that court's allocation decision, Colorado residents who purchased a Unity plan through Aliera have a claim for rescission and refund of their member payments, or for payment of their healthcare expenses, from those funds that will be allocated.

**D.    The Products Defendants Create, Market, Sell, and Administer Are Health Insurance**

61.    Defendant Unity authorized Defendant Aliera to create, market, sell, and administer healthcare products under the Unity brand that Aliera and Unity claimed were not insurance, and that they claimed qualified as HCSM products exempt from insurance regulation, even though (a) a substantial portion of those products were Aliera's own product that could never have qualified as an HCSM product, (b) Unity does not qualify as an HCSM, and (c) Colorado does not recognize HCSMs as exempt from state insurance law. Certain members of the class were enrolled in healthcare insurance products that were created, marketed, sold, and administered by Aliera under the Aliera/Unity brand.

62.    Defendant Trinity authorized Defendant Aliera to create, market, sell, and administer healthcare products under the Trinity brand that Aliera and Trinity claimed were not insurance, and that they claimed qualified as HCSM products exempt from insurance regulation, even though (a) a substantial portion of those products were Aliera's own product that could never have qualified as an HCSM product, (b) Trinity does not qualify as an HCSM, and (c) Colorado does not recognize HCSMs as exempt from state insurance law. Certain members of the class were enrolled in healthcare insurance products that were created, marketed, sold, and administered by Aliera under the Aliera/Trinity brand.

63.    The products Aliera created, marketed, sold, and administered, under both the Aliera/Unity and Aliera/Trinity brands were virtually identical, and were created to look, feel, and convey the impression that they are equivalent to insurance.

64.    The terminology all Defendants used in connection with their plans is directly analogous to terminology health insurers use. For example:

(a)    The products are described as health "plans," which is the same term the ACA uses to describe health insurance.

(b)    The healthcare plans marketed, sold, and administered charge "members" a "monthly contribution" to participate. Defendants described the "contributions" members pay as "premiums" or "rates." *See e.g., **Appendix 5***, pp. 3-4, ***Appendix 6.*** The amount of the premium charged is based on the plan selected by the insured.

(c)    The plans require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount." ***Appendix 5,*** p. 4, ***Appendix 6.***

(d)    Once this amount has been paid, then medical bills are paid in accordance with a benefits booklet or "Member Guide" for the selected plan. These Member Guides contain the "membership instructions" which detail the "eligible medical expenses," "limits of sharing," limitations on pre-existing conditions, and exclusions. The plans require pre-authorization of certain non-emergency surgeries, procedures or tests, as well as for certain types of cancer treatments. *See e.g., **Appendix 2***, p. 29, ***Appendix 3,*** p. 31.

(e)    The amount of the premium charged is based on the health care plan selected by the insured. The plans include "interim medical," "comprehensive," "standard," "basic care," and "catastrophic." ***Appendix 5,*** p. 1, ***Appendix 6,*** p. 6

(f)    The standard and comprehensive plans are offered at three benefit levels. "Standard" is offered at "Value," "Plus," and "Premium." "Comprehensive" is offered at

"Bronze," "Silver," and "Gold." The plans at the higher levels charge more and therefore provide more robust benefits for covered medical conditions. *Appendix 5*, p. 1, *Appendix 6.*

(g)     The plans provide coverage for medical expenses. Among other things, the plans provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, and emergency room services. *Appendix 2*, pp. 22-25, *Appendix 6.* The plans, for an additional premium, will also provide maternity care. *Appendix 5*, p. 7; *Appendix 3*, p. 24.

(h)     The plans have established preferred provider networks ("PPOs") through which members can seek care. Payments are made by Defendants directly to the providers.

(i)     The plans contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

(j)     The plans require members to pay a "co-expense," or "consult fee," analogous to a "copay." *Appendix 5*, p. 4, *Appendix 6.*

(k)     The plans provide for "maximum out of pocket" expenses. *Appendix 5,* p. 4; *Appendix 6.*

65.     Defendants claim they will make payments directly to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or "Member Shared Responsibility Amount," and otherwise meet the coverage requirements set forth in the coverage booklet. These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

66.     Payment from the program upon the occurrence of a covered loss is not voluntary. Under the terms of the program, as set forth in the Member Guides, Trinity (or Unity) is instructed and required to "share clearing house funds in accordance with the membership instructions." *Appendix 2*, p. 21; *Appendix 3,* p. 22. (Contributors' Instructions and Conditions). The members, however, have no role in the creation of the Member Guides or instructions. Members do not

decide who gets paid benefits. Instead, according to the Member Guide, the members must accept Trinity's or Unity's adjudication of benefits:  "By participation in the membership, the member accepts these conditions." *Id*. According to the Member Guide, Trinity or Unity, and not the members, is the "final authority for the interpretation" of the membership instructions, and Trinity or Unity directs payment to providers on behalf of members who have submitted medical claims that are covered under the benefits booklet. *Id*.

67.    Members' "contributions" (i.e. premiums) are not refundable. Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses. ***Appendix 2***, p. 16; ***Appendix 3***, p. 18.

68.    Members receive a card which is indistinguishable from an insurance card, and they are advised to keep it with them at all times to present to health care providers. ***Appendices 19, 21, 24, 29, 32.***

69.    Like insureds in traditional health plans, members receive an "Explanation of Benefits (EOB)" when a claim is submitted. The EOBs are identical in all material respects to EOBs received from traditional health plans. ***Appendix 28.***

70.    Healthcare providers bill Defendants directly, just as they bill insurance companies, and Defendants make payments directly to the health care providers.

71.    The healthcare plans are sold by insurance agents or brokers.

72.    Defendants' plans are contracts whereby Defendants undertake to indemnify a member upon the occurrence of determinable contingencies and therefore constitute "insurance" as defined by Colorado law. *See* § 10-1-102(12) C.R.S. The Colorado Division of Insurance has so concluded. ***Appendices 9, 10.*** Colorado does not exempt HCSMs from insurance regulation. Defendants are required to comply with Colorado and federal law governing health insurers.

E.    **The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal**

73.    None of the Defendants has a certificate of authority as required by C.R.S. § 10-3-105 from the State of Colorado to issue insurance within this state, and they are not authorized insurers under Colorado law. Each of the Defendants has issued illegal and unauthorized insurance products to Plaintiffs and other members of the class.

74.    Colorado has no exemption from health insurance regulations for HCSMs. Plans sold under both the Unity and Trinity names were illegal.

75.    Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements under the ACA's Essential Health Benefits. For example, the policies impose a 24-month waiting period on coverage, which is illegal under the ACA and Colorado law. *See* 42 U.S.C. § 300gg-3; C.R.S. § 10-16-118 .

76.    The plans include a "Dispute Resolution Procedure" that purports to require binding arbitration, which is illegal in Colorado. C.R.S. § 10-3-1116(3), and purports to require multiple levels of appeal in violation of 42 U.S.C. § 300gg-19(a)(2)(b), 45 C.F.R. § 147.136(b)(3)(G) and Colorado law, C.R.S. § 10-16-113(4)(a). This burdensome Procedure is not disclosed to consumers before they commit to enrolling in the plans. Defendants use the Procedure to subject members to Kafkaesque delays and false and inconsistent promises, to deny claims without conducting reasonable investigations, to refuse to authorize medical care, and ultimately to require illegal arbitration. Defendants claim the Procedure is legally binding on the members, while at the same time they claim that the coverage provisions are not legally binding upon them and that they are not legally obligated to pay claims. *See **Appendix 2**, p. 3; **Appendix 3**, p. 5; **Appendix 4**, p. 3.

77.    Neither Trinity nor Unity has maintained the 80% medical loss ratio required under the ACA, 42 U.S.C. § 300gg-18. Instead, according to its Agreement with Trinity, Aliera allocates only between 8.3% and 35% of member contributions to "Sharebox" payments to members. According to findings in the Georgia Litigation, Aliera took millions of dollars in administrative

fees. Similarly, less than 80% of the contributions Aliera collected on behalf of Unity members was paid in medical expense payments on behalf of members, and substantially more than 20% of the members' contributions are subject to dispute between Anabaptist and Aliera in the Georgia Litigation.

78.     The Member Guides, which have never been reviewed or approved, contain inconsistent and contradictory coverage terms and conditions. For example, on one hand they suggest that Defendants are required to administer benefits in accordance with the terms of the Member Guides, while other provisions suggest that Defendants are not required to pay any benefits whatsoever. The Member Guides also state the plans are an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," *Appendix 2*, p. 3; *Appendix 3,* p. 5, but in fact Defendants – like an insurance carrier – make all coverage decisions without ever presenting one member's needs to other members.

**F.     Multiple States Have Found that Defendants' Products Are Insurance That Do Not Qualify as HCSMs**

79.     On August 12, 2019, the State of Colorado Division of Insurance found Defendant Trinity was an unlicensed insurance company and that Defendant Aliera was developing and marketing unlicensed insurance, and issued cease and desist orders ordering them to immediately stop selling the unauthorized insurance in the State of Colorado. *Appendices 9, 10*. Final Agency Orders dated January 17, 2020 prohibit the sale of Aliera HCSMs in Colorado and prohibit Trinity from doing business in Colorado. *Appendix 11.*

80.     The State of Maryland found the Unity plans Aliera sold in that state were insurance that did not qualify for an exclusion under that state's health sharing law. On April 30, 2018, Aliera entered into a Consent Order with the State of Maryland agreeing to cease selling the plans in Maryland. *Appendix 12.*

81.    The State of Texas has successfully enjoined Aliera from enrolling any new members in Texas. As the Texas Attorney General argued on July 11, 2019 in *State of Texas v. Aliera Healthcare, Inc.,* Travis County Cause No. D-1-GN-19-003388:

> The Defendant Aliera Healthcare, Inc., is engaged in the business of insurance in this State without a license, in violation of Tex. Ins. Code § 101.101. … In meetings with State regulators, Aliera representatives have asserted that Aliera is exempt from state regulation because it merely administers a "health care sharing ministry." ***Aliera is no ministry, however; it is a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to "administrative costs."***

*Appendix 13,* pp. 1-2 (emphasis added).

82.    The Washington Insurance Commissioner conducted a formal investigation in response to consumer complaints and concluded that Trinity did not meet the statutory definition of an HCSM under Washington and federal law. *See **Appendix 14***. That Commissioner further concluded that Aliera acted as an unauthorized health care service contractor without being registered and was doing business as an unlicensed discount plan organization, and that Aliera's advertisements on behalf of Trinity were deceptive and had the capacity to mislead or deceive consumers into believing that they purchased insurance. On May 13, 2019, Washington State issued "Orders to Cease and Desist" to Aliera and Trinity. *Id.* On December 30, 2019, Trinity entered into a consent order that prohibited it from enrolling any new Washington residents, and was fined $150,000. *Id.*

83.    Similar orders have been issued in New Hampshire (October 30, 2019 Cease and Desist Order against Aliera and Trinity ordering them to stop selling or renewing illegal health insurance); Connecticut (December 2, 2019 Cease and Desist Order against Aliera and Trinity), Maryland (February 27, 2020 Order revoking Aliera's insurance producer license because it violated the 2018 consent order not to solicit membership in unauthorized insurance plans), and California (March 8, 2020 Cease and Desist Order finding Trinity did not meet the definition of

an HCSM, and that both Aliera and Trinity were acting as insurers in California without a certificate of authority and had misled California consumers). ***Appendix 15.***

84.    Regulators in Georgia and Massachusetts have also issued warnings. *See e.g.*, ***Appendix 16.***

85.    On March 31, 2020, the Washington State Insurance Commissioner found that Defendant Unity, now known as OneShare Health, LLC, was not a legitimate HCSM and was acting as an unauthorized insurer in the state of Washington. It issued a cease and desist order prohibiting it from continuing to solicit or sell insurance in Washington. ***Appendix 17.*** On May 5, 2020, a Washington Administrative Law Judge denied a motion to stay the order, citing sufficient prima facie evidence that OneShare was unlawfully transacting in insurance and did not qualify as an HCSM. ***Appendix 18.***

**G.    Plaintiffs Were Sold Sham Products by Some or All of Defendants**

   ***Plaintiff Rebecca Smith***

86.    Plaintiff Smith enrolled in AlieraCare PLUS in May 2018, while Aliera partnered with Unity.

87.    She made a payment to Aliera of $530.10 per month in premium payments to Aliera.

88.    Plaintiff Smith received a card that she believed to be an insurance card that reflected her enrollment with AlieraCare PLUS through Unity Healthshare. ***Appendix 19.***

89.    In November 2018, Plaintiff Smith received an email notifying her that Trinity HealthShare was Aliera's new HCSM partner, that she did not need to take any action to maintain her current plan under the Trinity/Aliera partnership, that her Member ID number and all benefits would remain the same, and that her MSRA (deductible) would carry over to the Trinity plan. *See **Appendix 20.*** She never received any subsequent notice that her plan, or her pending claims under her plan, would not automatically transfer to Trinity.

– 23 –

90.    Plaintiff Smith also received an Aliera/Trinity Member Guide, dated 2018-2019, identical to **Appendix 2.** That Member Guide was identical to the Member Guide she had received when Aliera was partnered with Unity, with the exception that Trinity's name was substituted for Unity's name.

91.    Plaintiff Smith also received an Aliera/Trinity Insurance card. Appendix 21. This card was virtually identical to the Aliera/Unity card, except for the use of the name "Trinity Healthshare" instead of "Unity Healthshare."

92.    On October 17, 2018, Plaintiff Smith contacted Aliera to confirm coverage for her planned method of birth control, an IUD.

93.    She was informed that her procedure would be covered at 100% and was not informed that the procedure would apply towards her MSRA/deductible.  In reliance on the assurance that it would be covered at 100%, she selected this form of birth control over a less costly form.

94.    After the procedure was performed, Aliera denied coverage of the procedure.

95.    Plaintiff Smith appealed the denial of coverage in writing, and, on May 6, 2019, Aliera informed Plaintiff Smith that Aliera reversed the denial and approved the coverage.

96.    Despite the approval, Aliera did not pay for the disputed services.

97.    In order to prevent the medical bills from going to collections, Plaintiff Smith paid for the uncovered medical services, totaling $1,156.23, despite Aliera's representations that it would cover the charges.

### Plaintiff Ellen Larson

98.    Plaintiff Larson enrolled in AlieraCare Premium in July 2018, while Aliera partnered with Unity.

99.    She made a payment to Aliera for $452.44 and to Unity for $25 in July 2018, and made monthly premium payments to Aliera of $352.44 per month each month from August

through December 2018. She received a Member Guide and a card that she believed was an insurance card showing that she was enrolled in the AlieraCare Premium plan through Unity. ***Appendix 22.***

100.    On or about November 15, 2018, Aliera sent Ms. Larson an email notifying her that Trinity HealthShare was its new HCSM partner, that she did not need to take any action to maintain her current plan under the Trinity/Aliera partnership, that her Member ID number and all benefits would remain the same, and that her MSRA (deductible) would carry over to the Trinity plan. She never received any subsequent notice that her plan, or her pending claims under her plan, would not automatically transfer to Trinity.

101.    Ms. Larson then received a Member Guide for her AlieraCare Premium Plan from both Aliera and Trinity. The Member Guide was identical to the Member Guide she had received when Aliera was partnered with Unity, with the exception that Trinity's name was substituted for Unity's name. ***Appendix 2.*** She also received a notice from Trinity about increased convenience and options for Trinity HealthShare members. ***Appendix 23.***

102.    Ms. Larson also received what she believed was an insurance card from Aliera/Trinity showing that she had been a member in Aliera/Trinity since July 1, 2018. *See* ***Appendix 24***. The insurance card falsely stated that she was a member "of a Health Care Sharing Ministry ***recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)***" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM.

103.    The AlieraCare Premium plan sold to Ms. Larson was insurance under Colorado law. However, it failed to comply with Colorado and federal law in its provisions of benefits.

104.    Ms. Larson was assaulted on August 3, 2018, while covered by the AlieraCare/Unity Premium Plan. She was attacked and knocked unconscious. She was taken to the hospital with serious injuries, including a skull fracture, cervical spine fracture, and intercranial bleeding. She submitted claims to Aliera for coverage.

105.    While her claim was pending, and after she was notified that her plan was transferred from Unity to Trinity, she terminated her coverage, effective December 31, 2018, without opting to have her plan transferred to Unity.

106.    When she submitted her bill for payment to Aliera, her claim was denied. She appealed, sending medical records and additional information. Aliera decided to cover a different denied claim as a result of the appeal. *Appendix 25.*

107.    Ms. Larson appealed a second time. She explained that Aliera had not responded to the correct appeal. Aliera then took the position that Ms. Larson's injuries were "self-inflicted" and excluded under her policy. *Appendix 26.*

108.    Ms. Larson filed a complaint with the Better Business Bureau and received another denial letter in response. *Appendix 27.*

109.    Ms. Larson continues to be pursued for these debts.

110.    Aliera held itself out as the agent for Trinity in administering Ms. Larson's claims. It sent her an Explanation of Benefits (EOB) under Trinity's name. *Appendix 28.* Its appeal denial letters use the same address – 5901 Peachtree Dunwoody Rd., Atlanta, GA 30328 – as Trinity's address. *Compare Appendix 26 with 1.* She was never notified that she needed to file a claim with the receiver in the Georgia Litigation, or to Unity, in order for her claim to be paid.

111.    Trinity and Aliera now claim that Ms. Larson was never enrolled in a Trinity plan and that she was only enrolled in a Unity plan. Ms. Larson submitted her claim to Aliera, who acted as exclusive agent for both Trinity and Unity. Neither Unity nor Trinity, nor their agent Aliera, have paid her claim.

### *Plaintiff Justine Lund*

112.    In January 2019, Plaintiff Lund enrolled in an AlieraCare "Trinity HealthShare Gold" plan effective February 1, 2019. Before purchasing the Trinity Gold plan, she was told that, after meeting her $2,500 "MSRA" (deductible), medical bills related to pregnancy and delivery

would be covered up to $5,000, or $8,000 for a caesarian section, and that 80% of hospital bills would be covered. She purchased the plan which she understood had the most robust coverage, even though it also had the highest monthly premium of the available Aliera/Trinity plans.

113.    Ms. Lund paid Defendants Aliera and Trinity $658.87 ($125 as an enrollment fee and $533.87 for the first monthly premium payment) on January 16, 2019, and $533.87 in both February and March 2019 for the Trinity HealthShare Gold coverage from February 1 – April 30, 2019.

114.    After she enrolled and made the initial payment, Ms. Lund received a Member Guide for AlieraCare Gold with the Unity brand attached. ***Appendix 3.*** She also received an ID card which she believed was an insurance card from Aliera/Trinity. The card shows that she was enrolled in a "Trinity/Gold" plan with a $2500 "MSRA." ***Appendix 29.*** The insurance card falsely stated that she was a "member of a HealthCare Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(B)," even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM. The backside of the card falsely represents an affiliation with Unity Healthshare, even though Aliera's relationship with Unity had terminated and it was no longer authorized to sell plans on behalf of Unity in 2019.

115.    After enrolling in the AlieraCare Trinity Gold plan, Ms. Lund had medical expenses that should have been covered by Aliera/Trinity, but Aliera/Trinity paid a fraction of what she understood would be covered. Because her medical expenses had not been paid as she had been led to believe they would be, she became worried that Defendants would not pay the maternity benefits that were represented and advertised. After numerous conversations with Aliera/Trinity employees and agents, she learned that Aliera/Trinity would require her to pay a $5,000 deductible and would cover only a fraction of her medical bills. She cancelled her AlieraCare Trinity Gold Healthshare plan, effective April 30, 2019.

116.    Ms. Lund was forced to pay medical bills that Defendants should have covered, and paid Defendants premiums for worthless health insurance coverage.

### Plaintiffs Jared and Jaime Beard

117.    Plaintiffs Jared and Jaime Beard enrolled themselves and their two dependent children in an AlieraCare/Unity Premium plan in August 2018, while Aliera partnered with Unity. Before enrolling, they spoke to an Aliera agent who told them that Aliera was like insurance rather than like an HCSM because medical providers bill Aliera directly, and the bills are paid directly to the provider. The Aliera agent sent them sell sheets that showed the Premium plan would provide extensive benefits comparable to insurance. *Appendix 6.*

118.    The Beards made a payment to Aliera for $819.32 ($694.32 for the first monthly premium payment and $125 in fees) in August 2018 and made monthly premium payments to Aliera of $694.32 through September 2019. They received a welcome email showing they were enrolled in the AlieraCare Premium/Unity Healthshare Premium plan. *Appendix 30.*

119.    In May 2019, the Beards received a notice that Aliera was no longer selling the Unity healthcare plan, but would continue selling an identical plan that "tracked" their medical history and historical claims, payments toward their MSRA, and time spent on the plan. *Appendix 31.* They received a Member Guide from Trinity, that was identical to the Member Guide they received when Aliera was partnered with Unity, with the exception that Trinity's name was substituted for Unity's name. *Appendix 4.*

120.    The Beards also received what they believed was an insurance card from Aliera/Trinity showing that they had been a member in Aliera/Trinity since August 15, 2018. *See Appendix 32.* The insurance card falsely stated that they were a member "of a Health Care Sharing Ministry *recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)*" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM.

121.    The AlieraCare Premium plan sold to the Beards under both the Trinity and Unity names, was insurance under Colorado law. However, it failed to comply with Colorado and federal law in its provisions of benefits.

122.    In April 2019, The Beards' minor child, who was covered under the plan, required surgery. Their child's provider contacted Aliera for preauthorization of the surgery. Aliera denied the request, inaccurately claiming that it was to treat a "pre-existing condition." *Appendix 33*. Both the Beards and their provider attempted on numerous occasions to reach Aliera to appeal the decision. When calls were finally returned, they received different explanations at different times. After informing them that it did not do "peer to peer" reviews, Aliera offered to speak with the provider, but did not return the provider's calls. The Beards wrote a letter again appealing the decision. *Appendix 34*. On or about June 4, 2019, Aliera informed the Beards that they were again denying the claim, purportedly based on the review of an outside "Medical Peer Review Company." *Appendix 35*. The review letter, dated May 28, 2018 (a year prior to the claim), first opined "that the treatment was/was not related to conditions that were pre-existing," and further failed to reasonably consider whether the needed surgery was for a pre-existing condition.

123.    As a result, the Beards had to postpone their child's needed surgery, have been forced to incur additional out-of-pocket expenses for deductibles (MSRAs) for which they received no credit under a legitimate healthcare plan, have paid medical bills that should have been covered, and paid Defendants premiums for worthless health insurance.

124.    The Beards' Trinity member portal from May 2019 reflected that they were covered by the Trinity plan. *Appendix 36*. The letter from the purported "peer reviewer" dated May 201[9] regarding preauthorization of the Beards' child's surgery was addressed to "Aliera Healthcare/Trinity HealthShare" and quoted the Trinity Member Guide. *Appendix 35*. Yet, Trinity now claims that the Beards were not covered by the Aliera/Trinity plan until June 2019 and were not covered by the Trinity plan at the time Aliera refused to authorize their child's surgery. The

Beards were never notified that they needed to file a claim with the receiver in the Georgia Litigation in order for their claims to be paid.

## VI.  CLAIMS FOR RELIEF

**A.    Illegal Contract against All Defendants**

125.    Plaintiffs reallege all prior allegations as though fully stated herein.

126.    Defendants sold Plaintiffs and all members of the proposed class unauthorized and illegal health insurance plans in violation of Colorado law:

(a)    The plans sold bearing both the Unity and Trinity names were insurance (*see* ¶¶ 61-72 above), but were sold without authorization in Colorado.

(b)    The plans failed to provide the essential health benefits required under the ACA and Colorado law.

(c)    The plans exclude coverage for pre-existing conditions and impose waiting periods.

(d)    The Member Guides contain inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

(e)    The plans included a binding arbitration provision illegal under Colorado law. C.R.S. § 10-3-1116. The illegal binding arbitration provision is part of unconscionable dispute resolution procedures designed to force members into illegal multiple levels of appeal, arbitrarily delay payment, and leave members without a meaningful method of contesting coverage decisions and disputes.

(f)    Defendants failed to maintain the 80% medical loss ratio mandated by the ACA, and instead paid substantially more than 20% in expenses, fees, and commissions to Defendant Aliera.

127.    Defendants Unity and Trinity authorized Defendant Aliera to create, market, and administer these illegal plans on their behalf.

128.     Plaintiffs and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under Colorado and federal law.

**B.     Breach of Fiduciary Duty – Aliera and Trinity**

129.     Plaintiffs reallege all prior allegations as though fully stated herein.

130.     Defendant Trinity, through its exclusive agent Aliera, represented that members voluntarily submit monthly contributions or gifts into a cost-sharing account, and that Trinity "acts as a neutral clearing house between members." *Appendix 2*, pp. 5, 16. While disclaiming that there is any legally binding agreement to reimburse members for medical needs, Aliera and Trinity claim Trinity will serve as "an independent and neutral clearing house, dispersing[sic] monthly contributions as described in the membership instructions and guidelines. *Id*., p. 14

131.     Aliera and Trinity further represented their trustworthiness by claiming Trinity is a "religious organization," is "faith based," and is based on "religious traditions." *Id*., pp. 3, 5.

132.     Aliera and Trinity represented that "since Trinity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Trinity HealthShare as the final authority for the interpretation of these guidelines." *Id*., p. 21.

133.     Aliera and Trinity represented that monthly contributions are "voluntarily given" to Trinity "to hold as an escrow agent and to disburse according to the membership escrow instructions." *Id*., p. 20

134.     Trinity, and its exclusive agent Aliera, have complete control over the financial "contributions" members pay, and complete control over the coverage decisions.

135.     Based on these representations and their control over members' "contributions," Aliera and Trinity have a fiduciary duty to the members.

136.    Defendant Aliera has also admitted in court filings in connection with the Georgia Litigation that it has a fiduciary duty to the members.

137.    Defendants have breached their fiduciary duty. Coverage decisions are made solely by the for-profit Aliera, and in order to secure its profits, not to provide coverage for members' medical needs. Plaintiffs and the class members have been arbitrarily denied claims for medical expenses, and have been denied pre-authorization of needed medical care, in order to enrich Defendants.

138.    Defendants fail to maintain adequate reserves to pay claims.  Instead, member contributions are commingled by Aliera with other funds, and the majority of the member contributions are paid to Aliera in undisclosed fees, and not to cover the medical needs of the members.

139.    Plaintiffs and the class members have been injured by Aliera's and Trinity's breaches of fiduciary duty. The funds that should have been used to pay their claims have instead been used to enrich Defendants. The profits should be disgorged and held in constructive trust for the benefit of the Plaintiffs and the class to pay their claims.

## C.    Breach of Fiduciary Duty – Aliera and Unity

140.    Plaintiffs reallege all prior allegations as though fully stated herein.

141.    Defendant Unity, through its exclusive agent Aliera, represented that members voluntarily submit monthly contributions or gifts into a cost-sharing account, and that Unity "acts as a neutral clearing house between members." *Appendix 3*, pp.5, 16. While disclaiming that there is any legally binding agreement to reimburse members for medical needs, Aliera and Unity claim Unity will serve as "an independent and neutral clearing house, dispersing[sic] monthly contributions as described in the membership instructions and guidelines. *Id*., p. 16.

142.    Aliera and Unity further represented their trustworthiness by claiming Unity is a "religious organization," is "faith based," and is based on  "religious traditions." *Id*., pp. 5, 7.

143.    Aliera and Unity represented that "since Unity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Unity HealthShare as the final authority for the interpretation of these guidelines." *Id.*, p. 22.

144.    Aliera and Unity represented that monthly contributions are "voluntarily given" to Trinity "to hold as an escrow agent and to disburse according to the membership escrow instructions." *Id.*, p. 21.

145.    Unity, and its exclusive agent Aliera, have complete control over the financial "contributions" members pay, and complete control over the coverage decisions.

146.    Based on these representations and their control over members' "contributions," Aliera and Unity have a fiduciary duty to the members.

147.    Defendant Aliera has also admitted in court filings in connection with the Georgia Litigation that it has a fiduciary duty to the members.

148.    Defendants have breached their fiduciary duty. Coverage decisions are made solely by the for-profit Aliera, and in order to secure its profits, not to provide coverage for members' medical needs. Plaintiffs and the class members have been arbitrarily denied claims for medical expenses, and have been denied pre-authorization of needed medical care, in order to enrich Defendants.

149.    Defendants fail to maintain adequate reserves to pay claims.  Instead, member contributions are commingled by Aliera with other funds, and the majority of the member contributions are paid to Aliera in undisclosed fees, and not to cover the medical needs of the members.

150.    Plaintiffs and the class members have been injured by Aliera's and Unity's breaches of fiduciary duty. The funds that should have been used to pay their claims have instead been used to enrich Defendants. The profits should be disgorged and held in constructive trust for the benefit of the Plaintiffs and the class to pay their claims.

**D.    Unjust Enrichment Against Aliera**

151.    Plaintiffs reallege all prior allegations as though fully stated herein.

152.    Plaintiffs and the class paid substantial monthly contributions, the majority of which were siphoned off as fees to benefit Aliera.

153.    Plaintiffs and the class made the payments with the understanding that the funds would be shared among the members of Trinity or Unity to pay medical claims. They were never advised that a majority of their payments would actually go to Aliera's fees and commissions.

154.    Aliera has retained the members' contributions while arbitrarily denying medical claims, and has been unjustly enriched at the expense of Plaintiffs and the class.

155.    Plaintiffs and the class are entitled to restitution of the amount Aliera unjustly retained.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class members request that this Court:

(a)    Certify that this action may proceed as a class action as defined in ¶ 24 above;

(b)    Designate Plaintiffs Rebecca Smith, Ellen Larson, Justine Lund, and Jaime and Jared Beard as class representatives, and designate Eleanor Hamburger and Richard Spoonemore, Sirianni Youtz Spoonemore Hamburger, PLLC, Michael David Myers, Myers & Company, PLLC, and Victoria Lovato and Patrick J. Bernal, Michael Best & Friedrich, as class counsel;

(c)    Declare that Defendants' unauthorized health insurance plans were and are illegal contracts;

(d)    In accordance with C.R.S. § 10-3-1004, order Trinity to deposit cash or securities, or post a bond in an amount equal to the contributions made by Colorado residents for Trinity healthcare plans;

(e)     In accordance with C.R.S. § 10-3-1004, order Unity to deposit cash or securities, or post a bond in an amount equal to the contributions made by Colorado residents for Unity healthcare plans;

(f)     Enjoin Defendants from denying and delaying payment for legitimate health care claims;

(g)     Order Defendants to (i) rescind the unauthorized health insurance plans and refund all premiums improperly received from members of the proposed class, including interest; or, at the option of any class member (ii) reform the unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, permit class members to submit claims for medical services, costs and other expenses that would have been covered;

(h)     Enter judgment in favor of Plaintiffs and the class on their breach of fiduciary duty claims, order Defendants Aliera and Unity to disgorge all sums received in violation of their fiduciary duty from Unity members, and impose a constructive trust for the benefit of the class on all the amounts disgorged, and order Defendants Aliera and Trinity to disgorge all sums received in violation of their fiduciary duty from Trinity members, and impose a constructive trust for the benefit of the class on all the amounts disgorged;

(i)     Order restitution of all contributions Aliera unjustly retained;

(j)     Order payment of reasonable attorneys' fees; and

(k)     Grant such other relief as this Court may deem just, equitable and proper.

## VIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  August 18, 2020.

*s/ Eleanor Hamburger*
Eleanor Hamburger

*s/ Richard E. Spoonemore*
Richard E. Spoonemore
Sirianni Youtz Spoonemore Hamburger PLLC
3101 Western Avenue, Suite 350
Seattle, WA  98121
Tel.: (206) 223-0303
Email:  ele@sylaw.com
Email:  rick@sylaw.com

*s/ Victoria E. Lovato*
Victoria E. Lovato, #31700
Michael Best & Friedrich LLP
1776 Lincoln Street, Suite 1100
Denver, CO  80203
Tel. (720) 240-9515
Email:  velovato@michaelbest.com

*s/ Patrick Bernal*
Patrick Bernal, #52956
Michael Best & Friedrich LLP
8300 Arista Place, Suite 300
Broomfield, CO 80021
Tel. (303) 800-1580
Email:  pjbernal@michaelbest.com

*s/ Michael David Myers*
Michael David Myers
Myers & Company PLLC
1530 Eastlake Avenue East
Seattle, WA 98102
Tel. (206) 398-1188
Email:  mmyers@myers-company.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **Matthew C. Baisley**
  mbaisley@bakerlaw.com, rmann@bakerlaw.com, sbeer@bakerlaw.com
- **Patrick J. Bernal**
  pjbernal@michaelbest.com; aekeller@michaelbest.com;
  courtmail@michaelbest.com; fmwiley@michaelbest.com
- **Kristen K. Bromberek**
  kristen.bromberek@alston.com
- **Marilyn S. Chappell**
  mchappell@sweetbaumsands.com, mmaclennan@sweetbaumsands.com,
  kroche@sweetbaumsands.com
- **Sarah Renee Craig**
  scraig@burr.com, lgmiller@burr.com, dmorales@burr.com
- **Victoria Edna Lovato**
  velovato@michaelbest.com, CourtMail@michaelbest.com,
  pmclevenger@michaelbest.com, Vicki_lovato@yahoo.com
- **Michael David Myers**
  mmyers@myers-company.com, slin@myers-company.com
- **Laurin D. Quiat**
  lquiat@bakerlaw.com, sbliss@bakerlaw.com, dscallorn@bakerlaw.com
- **Jason Robert Rottner**
  jason.rottner@alston.com
- **Jon F. Sands**
  jsands@sweetbaumsands.com, mmaclennan@sweetbaumsands.com,
  kroche@sweetbaumsands.com, ccross@sweetbaumsands.com
- **Richard E. Spoonemore**
  rick@sylaw.com, matt@sylaw.com, rspoonemore@sylaw.com,
  theresa@sylaw.com, stacy@sylaw.com
- **Kyle G.A. Wallace**
  kyle.wallace@alston.com, lisa.dye@alston.com.

DATED:  August 18, 2020, at Seattle, Washington.

_s/ Eleanor Hamburger_
Eleanor Hamburger
Attorneys for Plaintiffs